No.-22-10256

_____

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH  CIRCUIT
_____

UNITED STATE OF AMERICA
Plaintiff-Appellee,

vs.

PETER SOTIS,
Defendant-Appellant.

_____

Appeal from the United States District Court
For the Southern District of Florida
Lower Case No. District: 113C-1 : 1:19-cr-20693-PAS-1
The Honorable Patricia A. Seitz

**BRIEF OF APPELLANT
PETER SOTIS**

_____

Jane H. Ruemmele, Attorney at Law
22 E. Washington Street Ste 610
Indianapolis, IN 46204
Tel: 317-491-1050
Fax:  317-491-1043
Email: Jane@chjrlaw.com


Attorney for Defendant-Appellant,
Peter Sotis

_____

No.22-10256

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH  CIRCUIT
_____

UNITED STATE OF AMERICA
Plaintiff-Appellee,

vs.

PETER SOTIS,
Defendant-Appellant.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

Comes now Appellant PETER SOTIS, by and through undersigned counsel, in accordance with the United States Court of Appeals for the Eleventh Circuit Rules (Rev. 4/01/20), 11th Cir. R. 28-1(b) and 11th Cir. R. 26.1-1, discloses the following  interested persons and  Corporate Disclosure Statement:

| | |
|---|---|
| Andy Camacho | Assistant United States Attorney |
| Hulda Odette Estama | Defense counsel, Trial level |
| Juan Antonio Gonzalez | United States Attorney for the Southern District of Florida |
| Nicole Grosnoff | Assistant United States Attorney |
| Yvette Hernandez | Court reporter |

David Lim                          US Dept of Justice

Chris M. McAliley                  Magistrate

Reginald Moss                       Counsel for Emilie Voissem, codefendant

John J. O'Sullivan                 Magistrate

Alicia Otazo-Reyes                 Magistrate

Laura Thomas Rivero                 Assistant United States Attorney

Lisa Tobin Rubio                   Assistant United States Attorney

Patricia A. Seitz, Senior          Trial Judge
U.S. District Court Judge

Nathan Michael Swinton             US Dept of Justice

Michael Thakur                     Assistant United States Attorney

Edwin G. Torres                    Magistrate

Bruce Lee Udolf                    Defense counsel, Trial level

Ursula Ungaro                      Trial Judge

## STATEMENT REGARDING ORAL ARGUMENT

Sotis  requests oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND        ii
CORPORATE DISCLOSURE STATEMENT (CIP)

STATEMENT REGARDING  ORAL ARGUMENT        iv

TABLE OF CONTENTS        v

TABLE OF AUTHORITIES        vii

JURISDICTIONAL STATEMENT        x

ISSUES PRESENTED FOR REVIEW        1

STATEMENT OF THE CASE        1

SUMMARY OF THE ARGUMENTS        11

ARGUMENT        14

I. COUNTS 1, 2 AND 3 ARE NOT SUPPORTED
BY SUFFICIENT EVIDENCE

    A.    The Government Charged but Failed to Prove that the rEVO  14
III Rebreathers Were Closed-Circuit Rebreathers Creating a Fatal
Variance

    B.    Proving a Closed-Circuit Rebreather as Charged was  17
Critical Since Rebreathers Included in the Commerce Control List
under 8A992 Did Not Require a License to Ship to Libya

    C.    Prejudicial Evidence on Closed-Circuit Rebreathers Was  22
Not Objected to Because the Government Had Alleged Illegal
Export of Closed-Circuit Rebreathers

    D.    Sotis and Voissem Had a Good Faith Basis for their Belief  28
That the rEVO III Rebreather Was Not Dual Use Since It Had
Been Rejected by The Military

    E. Sotis and Voissem Did Not Commit a Conspiracy      38

II. THE GOVERNMENT ELICITED TESTIMONY THAT      40
INVADED THE PROVINCE OF THE JURY AND DENIED SOTIS
A FAIR  TRIAL

III. THE TRIAL COURT MISAPPLIED THE GUIDELINES  AND      43
RENDERED A SENTENCE THAT IS DISPARATE TO OTHERS
SIMILARLY SITUATED

    A. The Sentencing Error Was Not Harmless      48

CONCLUSION      49

CERTIFICATE OF COMPLIANCE WITH FED.R.APP. 32(a)(7)(C)      50

CERTIFICATE OF SERVICE      50

# TABLE OF AUTHORITIES

## CASES

*In re Winship*, 397 U. S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)    14

*Marx & Co. v. Diners' Club, Inc*., 550 F.2d 505 (2 Cir. 1977)    42

*Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S. Ct. 241, 79 L. Ed. 446 (1935)    22

*Stinson v. United States*, 508 U.S. 36, 38, 123 L. Ed. 2d 598, 113 S. Ct. 1913 (1993)    44

*United States v. Amirnazmi*, 645 F.3rd 564 (3rd Cir. 2011)    48

*United States v. Banki*, 685 F. 3rd 99 (2nd Cir 2011)    47

*United States v. Bass*, 404 U.S. 336, 347, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971)    44

*United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996)    42

*United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997)    27

*United States v. Caporale*, 806 F.2d 1487, 1499 (11th Cir. 1986)    27

*United States v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999)    27

*United States v. De La Mata*, 266 F.3d 1275, 1302 (11th Cir. 2001)    47

*United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011)    14

*United States v. Duncan*, 400 F.3d 1297, 1301 (11th Cir. 2005)    41

*United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009)    22

*United States v. Francois*, 661 Fed.Appx. 587 (11th Cir. 2016)    48

*United States v. Fuentes-Coba*, 738 F.2d 1191  (11 Cir. 1984)          42

*United States v. Guevara*, 894 F.3d 1301, 1311 (11th Cir. 2018)          43

*United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015)          26

*United States v. Jenkins*, 779 F.2d 606, 616 (11th Cir. 1986)          27

*United States v. Jeter*, 329 F.3d 1229, 1230 (11th Cir. 2003)          44

*United States v. Johnson*, 155 F.3d 682, 685 (11th Cir. 1998)          44,45

*United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004)          47

*United States v. Mousavi*, 604 F.3d 1084, 2010 U.S. App. LEXIS 9213          28
(9th Cir. 2010)

*United States v. Panfil*, 338 F.3d 1299, 1302 (11th Cir. 2003)          44

*United States v. Piquet*, 372 Fed Appx. 42 (11th Cir. 2010)          48

*United States v. Pulungan*, 569 F.3d 326 (7 Cir. 2009)          22

*United States v. Reyes*, 270 F.3d. 1158, (7th Cir. 2001)          48

*United States v. Rodriguez-Matos*, 188 F.3d 1300, 1310 n.20 (11th Cir.          44
1999)

*United States v. Singh*, 291 F.3d 756, 761 (11th Cir. 2002)          44

*United States v. Vasquez*, 2018 WL 3814727 (11th Cir. 2018)          48

## RULES AND REGULATIONS

22 CFR. Part 121.1 (United States Munitions List)          10,13,45,
46

15 CFR § 730.3 (Dual-Use)          4,5,7,21,2
8

15 CFR, part 738.4 (a)(2)(ii)(A                          20

15 CFR Part 740                                          20

15 CFR Part 740.20                                       20

Commerce Control List (CCL), category 8, 8A002q.1        11,15,18

Commerce Control List (CCL), category 8, 8A002q.2        18

Commerce Control List ( CCL), category 8, 8A992          11,17,19,
                                                         20,46

 Federal Sentencing Guidelines, Section 2M5.1            45,46,47,
                                                         49

Federal Sentencing Guidelines, Section 2M5.2            43,45,46,
                                                         47,48,49

Federal Sentencing Guidelines, Section 2M5.3            45

## OTHER AUTHORITY

American Heritage Dictionary of the English Language     46

Due Process Clause of the United States Constitution     14,43

Sixth  Amendment to the United States Constitution       43

Country Chart                                            11

https://www.treasury.gov/resource-                       5,32-
   center/sanctions/Programs/Documents/libya_eo_20160419.pdf   33,34,37
 (Obama Executive Order)

## JURISDICTIONAL STATEMENT

1.      The original jurisdiction of the U.S. District Court for the Southern District of Florida vested pursuant to 18 USC 3231 upon the U.S. Government's filing of an Indictment on October 24, 2019, against Peter Sotis (Sotis)  charging him with one or more federal offenses. (ECF. 3). The jury trial concluded on October 21, 2021, and resulted in guilty verdicts on all  counts. (ECF. 102).

2.      The sentencing judgment was entered on January 13, 2022. (ECF. 156).

3.      This  appeal is from a final order or judgment that disposes of all parties' claims.

4.      Pursuant to 28 USC 1291 and 18 USC 3742, the Eleventh  Circuit has jurisdiction of this appeal from the Southern District of Florida.

5.      The Notice of Appeal was filed on January  20, 2022. (ECF. 160). Per order of the court, Peter Sotis' brief is due on or before  June 6, 2022.

## eISSUES PRESENTED FOR REVIEW

I. Whether Counts 1, 2, and 3 are supported by sufficient evidence;

II. Whether testimony elicited by the government invaded the province of the jury and denied Sotis a fair trial; and

III. Whether the trial court misapplied the Guidelines and rendered a sentence that is disparate to others similarly situated.

## STATEMENT OF THE CASE

The facts of this case focus on a five-month period from April, 2016, to August, 2016, involving one shipment of scuba equipment, which included 4 rEVO III rebreathers (rEVO III) . These rebreathers are the items the government claims required a license, that Peter Sotis (Sotis) knew a license, and required before he willfully defied the licensing laws to allow merchandise to be picked up by the domestic client he had dealt with directly throughout the business transaction.

Sotis owned a business called Add Helium in Fort Lauderdale, Florida (Tr. Vol. I, p. 43) selling and training in the use of underwater gear.  (Tr. Vol. III, p. 12). His assistant and alleged coconspirator, Emilie Voissem (Voissem) was described as his "right-hand man." (Tr. Vol. III, p.15). Shawn Robotka (Robotka) was a 50-50 manager, while Sotis was the majority shareholder and managing member. (Tr. Vol. III, p. 12). Robotka owned twenty percent of the company. (Tr. Vol. III, p. 14).  In December, 2016, Robotka filed a civil suit against Sotis (Tr. Vol. III, p. 156), eventually obtaining

a judgment against him. (Tr. Vol. III, p. 192) Robotka testified as a government witness at trial.

On April 5, 2016, Ramas LLC (Ramas) a family-owned shipping company in Virginia owned by Diana Zaghab (Diana) and Muhammad Zaghab (Muhammad) (Tr. Vol. I, p.8)  prepared a commercial invoice for Osama Bendadik (Bendadik), a resident of Virginia with dual US/Libyan citizenship (Tr. Vol II, p. 24) and for "CODI Group-Submarine Services" located in Libya for certain "diving equipment-recreational." Ex. 8C (Appellant's App. Vol. II, p. 1,2). That same day, Sotis directed Voissem in an e mail to prepare an invoice for Bensadik.  Ex. 12A (Appellant's App.Vol. II, p.3-11). Add Helium prepared an invoice for Ramas for several items, including four  rEVO III's, which included no charges for shipping: "To Be Determined" Ex.  7A (Appellant's App. Vol. II, p. 12-14).

On April 20, 2016, Add Helium received a wire transfer from Ramas and on May 3, 2016, received two more payments. Ex.  7D, 7E, 7F (Appellant's App.  Vol.II, p.15-20).  On May 9, 2016, Add Helium invoiced Ramas directly for $35,340.  Ex.  7C (Appellant's App.Vol. II, p.21-22). On May 27, 2016, Voissem memorialized a discussion wherein the invoices were changed to reflect the entity, Ramas LLC.  Ex. 12E (Appellant's App. Vol.II p.23-24). On June 3, 2016, Sotis sent an e mail to Simon Nadim regarding arrangements for an instructor in Libya for the rebreathers, and acknowledged that Bensadik was the purchaser of the rEVO units, and that "Osama

would be bringing them to Libya." Ex. 12F (Appellant's App. Vol.II, p. 25-28). On July 7, 2016, a wire in the amount of $22,923 was paid by Ramas. Ex. 7H, 12K (Appellant's App. Vol.II, p. 29-36).

On July 27, 2016, Global Forwarding, a shipping company Add Helium used for their larger freight orders (Tr. Vol. IV, p.19), alerted Voissem the Libya shipment "might be more complicated than originally thought." Ex. 12L (Appellant's App.Vol. II, p. 37-46). On July 28, 2016, Voissem notified Sotis of Global Forwarding concerns with shipping to Libya and Sotis responded, "see how time consuming it might be, then we can make a determination." Ex. 12O (Appellant's App.Vol II, p.47-49).

On July 29, 2016, Voissem sent an e mail to Diana, asking "do you have experience shipping items by air freight to Libya? If so, perhaps your shipper may be the better choice?"  Voissem explained, "The products being shipped are considered by us to be recreational/technical diving equipment. I … should know more when I speak to them. If the items are able to be sent, a harmonized code will have to be identified for each item." Ex. 12S (Appellant's App. Vol. II. p. 53-58). That same day, Voissem sent an e mail to Mohammad telling him that their shippers put an alert on the shipment because it was going to Libya, and that she had been working to get a "more definitive answer regarding the shipment" and "if the items could in fact be shipped." She continued that it was the first time she had had "anything like this happen" and they were working to resolve it. She finally stated that "we may need your assistance

regarding the shipment or may need documentation regarding the purpose of the equipment." Ex. 12BB (Appellant's App.Vol. II, p.59-71).[1] That same day, Diana sent an email to Voissem and stated that they usually ship but had "the understanding" that Add Helium would ship. Diana stated that "usually the Dept of Commerce/Export.gov <http://export.gov/ would require a special license if the commodity is considered sensitive, high technology (examples of products that require export licenses are electronics, sensors and lasers, space satellite equipment, navigation equipment and microorganisms)."  Diana then inquired: "Is your diving equipment considered special high tech or can be deemed as dual use? Was an SLI issued to the shipper and by who?" Diana then explained, "there are certain restrictions to Libya but it is not considered a sanctioned country such as Iran, Sudan, etc."   She informed Voissem that "the consignee in Libya is a private business and not on the OFAC's Blocked party List." She asked to be informed as to any documentation that might be required to assist in the shipment. Ex. 12BB (Appellant's App. Vol.II, p. 70-71). That same day, Voissem sent an email to Sotis, stating that "(Diana) seems to have knowledge regarding shipping information etc. for his company," and stated, "the "Bureau of Industry and

---

[1] Ex BB  (Appellant's App. Vol II, p. 59-74) is a long e mail chain, portions of which are recreated in other exhibits. Exhibit BB is important to examine in its entirety, both for the chronology of the communication and context.

Security and Office of Export enforcement… did tell me that shipping to Libya was probably not going to happen because of how volatile it still is." The email continued, "Shawn (Robotka) also found a document that was issued in April by the president basically banning export of goods and stopping travel from the US." Ex. 12T (Appellant's App.Vol. II, p.75-78). On July 30, 2016, Peter responded: "Ok, if the president has banned all shipments to Libya, they are going to have to find another route or handle it from here. We do not need trouble from the government for making an illegal shipment. I think its time Osama and Mohammed manage this problem and let us know how they intend to receive ***their goods*** as we can't ship to Libya (***emphasis supplied***)." Ex. 12U (Appellant's App. Vol.II, p. 80-84). On August 1, 2016, Voissem forwarded to Diana the link to the Obama executive order, stating that "It is looking like we may not be able to ship to Libya…," then asking that "if you have other information or knowledge in the meantime please let me know." Ex. 12BB (Appellant's App.Vol. II, p.70). Diana responded to Emilie's concerns about a total ban on shipments to Libya by stating, "I don't believe that this president declaration applies to us because our customer is not on the blocked party list. This declaration applies to individuals that have property, assets or bank accounts in the US that are on the blocked party list or individuals with terrorist ties and against the Libyan government. We are not importing oil or other sanctioned items or exporting technical equipment or weaponry that could be used in a dual-use manner. Those would require

special permission and licensing." Ex. 12BB (Appellant's App.Vol. II, p. 69). That same day, Muhammad sent an e mail, stating, "Please let us know if you want us to handle the shipping through our shipping companies. If that is the case we will need the codes so we can generate the paperwork. In addition, we will need you to refund and wire the shipping cost ASAP to our company account so we can do the booking (We have to pay upfront for air shipping). Wire information attached." Ex. 12BB (Appellant's App. Vol.II, p.66). Voissem responded, "it may be appropriate and in the best interest of time for the shipping to go through you. We do apologize regarding this shipping issue, however it is out of our hands and there was no indication from our shipping company of any issues or concerns until they went to book it. Voissem inquired: "Would you still want the items to be picked up here at Add Helium with your shipping company?" Ex. 12BB (Appellant's App. Vol.II, p.66).

The next day, Mohammad indicated in an e mail that Ramas had assumed responsibility for the shipping, stating: "Can you tell us when do you think you will be done with the codes so we can do the booking. We would like to have the goods picked up this Thursday if possible so we do not loose (sic) another week (Providing we can arrange for booking this week). We would arrange for the shipping company to pick up the goods from your store. Ex. 12BB (Appellant's App.II, p. 65).

In the meantime, Voissem had contacted the Department of Commerce regarding the proper procedures for shipment. (Tr. Vol. IV, p 24-25). Following

Voissem's contact, special agent Brent Wagner (Wagner), who at the time worked at the Bureau of Industry Security (BIS) under the Department of Commerce, was assigned to call upon Add Helium. He arranged to meet with them on August 4. (Tr. Vol. I, p 117, 145). A day before the meeting with Wagner, Voissem communicated with Global Forwarding and indicated that "the customer is going to take over." Ex. 12Z (Appellant's App. Vol.II, p. 86). Add Helium had made the decision to not export the items in the days before Wagner had a meeting with them.

Testimony conflicts as to what was said and done at the meeting between Add Helium and Wagner. Wagner explained what dual-use technology is, that which can be used for either military or civilian application. (Tr.Vol. I, p. 43). Wagner explained due diligence, transshipping, and transferring to another party. (Tr.Vol. I, p. 47-48). Wagner told Voissem she needed to find out more information on this equipment and where the equipment ultimately was going (Tr.Vol. I, p 59). Wagner applied for a "license" for them (Tr.Vol. I, p 51) and said he would expedite it, but clarified in testimony it was a "determination" of whether a license was needed, and did not apply for it until, at the earliest, August 15, 2016 (Tr.Vol. I, p. 125-126, Ex 20). Robotka testified that Wagner was there "to help us with SNAP-R, an on-line system to get us a code for approval." (Tr. Vol. III, p. 43-46). Wagner testified that he clearly informed Voissem at that time that the shipment was not to go anywhere. (Tr. Vol. I, p. 167). He testified that although he did not seize the items, he said they were "detained." (Tr.Vol.

7

I, p. 160).    Voissem, a former law enforcement officer, said that Wagner did not say that, or anything to that effect. (Tr.Vol. IV, p. 27). Voissem heard Wagner discuss restrictions on exporting, but not on selling to a domestic buyer.  (Tr.Vol. IV, p. 27-29). Wagner wrote in his report it was clear that Add Helium "was not attempting to violate export law, they just did not understand them." (Tr.Vol. I, p. 119). Wagner had not put in his  report that the product had been detained (Tr.Vol. I. p. 120). Wagner did not prepare a supplemental report until September 2, which was after the items were exported by Ramos.  (Tr.Vol. I, p. 122). Wagner admitted that he personally did to know if a license was required to ship rebreathers to Libya. (Tr.Vol. I. p. 12

 Zaghab indicated that the crates had been picked up from Add Helium.  Ex. 12HH (Appellant's App. Vol. II, p.94-86). The air cargo manifest described the nature of the goods as "Diving Equipment-Recreational." Ex. 8E (Appellant's App.Vol. II, p. 98), as had the original order that came in to Ramas by their customer in Libya.  Compare, Ex.  8C (Appellant's App. Vol.II, p.1-2).

On August 17, 2016, Wagner received a preliminary determination on the license he had requested on behalf of Add Helium, called them,  and spoke with Voissem and Sotis. (Tr.Vol. I, p. 69-71). This was first time Wagner talked with Sotis personally and it was after Ramas had picked up their merchandise.  (Tr.Vol. I, p. 125-126).  On August 24, 2016, Wagner had a second meeting at Add Helium with personnel, and this time, brought an FBI agent with him. (Tr. Vol. I, p. 75) Testimony

differs as to when Wagner was first notified that merchandise had been picked up August 8, 2016, and who informed him. On August 25, 2016, Wagner sent a subpoena to Add Helium in reference to "all shipment made to Libya, either directly or through means of transshipping, from 8/30/2011 to present." Ex. 11 (Appellant's App.Vol. II, p.101). On August 26, 2016, per Wagner's request, Strike Aviation returned the items. Exs. 4, 6 (Appellant's App. Vol. II, p. 104-111). Alberto Puras with US Customs and Border Protection testified that he seized the rebreathers on October 25, 2016 for the failure to acquire a "PSB61" (sic) license, which appears to be a DSP-61 license. (Compare, Tr.Vol. I, p. 173, with Appellant's App. Vol. I, p. 137). The DSP-61 pertains to "defense articles." (Appellant's App. Vol.II, p. 137). The rEVO III's were rejected for military use. (Tr.Vol. III, p. 125-127). The government never proved that they were "military articles" requiring a DSP-61 license or any other any other type of license.

On October 24, 2019, Sotis and Voissem were charged by sealed Indictment (ECF. 3), with three counts related to unlawful export.[2] Codefendant, Voissem, was

---

[2]

| Count 1 | 18 U.S.C.§371 | Conspiracy to Export Items in Violation of the International Emergency Powers Act ("IEEPA") |
| Count 2 | 50 U.S.C. §§ 1705(a) & (c) | Export and Attempted Export of Goods in Violation of IEEPA |
| Count 3 | 18 U.S.C. § 554(a) | Smuggling of Goods |

also charged, along with an additional Count 4 of False Statement, 18 U.S.C §
1001(a)(2). (ECF. 3). The Indictment alleged a conspiracy between Sotis and Voissem
in Count 1, beginning on or about April 5, 2016, and continuing to October 25, 2016.
(ECF. 3). The Jury trial was conducted on October 14-21, 2001. (Appellant's App.Vol.
I., p. 10).  At trial, Shawn Robotka (Robotka), part owner of Add Helium, testified that
the military was looking at "this particular model," the rEVO that was "sold to
Obama," that it was reviewed by the Navy Experimental Dive Unit (NEDU) for use in
the military, but had failed (Tr. Vol. III, p. 125-127). The jury returned a verdict of
guilty for Sotis and Voissem on all counts on October 21, 2021. (Appellant's App. Vol.
I, p. 27-28).

Sentencing was held on January 21-22, 2022. (Appellant's App. Vol. I, p. 39). [3]
The Guidelines refer to three possible sections for these types of convictions, namely
2M5.1, 2M5.2, and 2M5.3. The Court chose to apply 2M5.2 rather than 2M5.1, even
though semi-closed rebreathers are not specifically listed under the Munitions List.
The court imposed a sentence of 57 months on all counts, served concurrently, with
three years of supervised release.  (Appellant's App. Vol. II, p 61-63).   Although the
Court issued a downward departure, had the Base Level been properly calculated, it
would have yielded an advisory sentence of 27-33 months, a sentence far lower than

_____

[3] The sentencing transcript  is two volumes prepared by two different court reporters.
They will be distinguished by date.

the 57-month sentence Sotis received.

## SUMMARY OF THE ARGUMENT

I.      Regarding sufficiency of the evidence, the government charged but failed to prove that the rEVO III's were closed-circuit rebreathers, as charged in the indictment.  Not all items on the Commerce Control List (CCL) and assigned an  Export Control Classification Number (ECCN) require a license. Sotis was charged under CCL, category 8, subsection 8A002 q.1, pertaining specifically to closed circuit rebreathers. 8A002 is  controlled for NS (national security) and AT, (anti-terrorism), however, subsection 8A992 pertaining to marine equipment not controlled by 8A002 was not controlled for AT. According to the Country Chart, as of November, 2016, Libya was controlled only with regard to the NS classification, not the AT classification. The rEVO III was rejected for military use. The government argued nonetheless at sentencing that they could nonetheless be used in training. As such, the government never distinguished the rEvo III from an ordinary open-circuit rebreather not controlled for shipment to Libya.

This variance was fatal. Prejudicial evidence on closed-circuit rebreathers was not objected to at trial because the government had alleged illegal export of closed-circuit rebreathers. The government presented ample evidence at trial as to the dangers of closed-circuit rebreathers, describing them as "stealth" and explaining how they might be used to commit a terrorist attack. Yet, the rEVO III's were rejected for

military application and were incapable of performing in the "stealth" manner described to the jury. They were not closed-circuit rebreathers. Trial counsel did not object to testimony regarding closed-circuit rebreathers because it was an element of the indictment. It was the government's burden to prove it.

Sotis and Voissem had a good faith basis for  in their belief that the rEVO III was not "dual-use" since it had been rejected by the military. After Dianna and Muhammad Zaghab told Voissem they would handle the shipment because they shipped to Libya all the time and had extensive knowledge in the field, e mail discussions show that the  details of whether an item is "dual-use" were flushed out in the process of reaching the conclusion by Diana that no license was required. The communications show that the parties were not trying to avoid the licensing requirements. Rather, they were trying in good faith to figure out what they needed to do.

Sotis and Voissem did not commit a conspiracy. The only understanding  Sotis and Voissem had was that they were in over their head on the decision of whether a license as needed, so they made the decision not to ship. Sotis and Voissem sold the items to Ramas, in a domestic sale, and Ramas picked up the items from Add Helium. Sotis did not ship, and Voissem did not ship. They did not "transship" to another country  to avoid a direct shipment to Libya. If anybody needed a license it was Ramas, shipping from the US to Libya. According to the BIS, a division of the US Department

of Commerce, the primary responsibility to ensure the export complies with the Export Administration Regulations (EAR) is the exporter.

II. The government elicited testimony that invaded the province of the jury and denied Sotis a fair trial. Michael Tu testified that he decided a license was required, based on information he received that the items were a closed-circuit rebreathers and micro circuit rebreathers, or closed-circuit rebreathers and semi-closed-circuit rebreathers. Tu did not go through the analysis, or give the jury the facts upon which to make that determination themselves. Agent Wagner testified regarding willfulness on the part of the defendants, stating over objection, "I have never seen this much knowledge in a case like this." The ultimate issues--- whether a license was in fact required for the rEVO III's, proven not by someone's summary opinion, but by the evidence of the relevant factors, whether Sotis knew these factors required a license, and then willfully violated the law ---were not left up to the jury. The government elicited opinion testimony on those issues. The jury was told what to think. Sotis was denied a fair trial, requiring a reversal of all his convictions.

III. The trial court misapplied the guidelines and rendered a sentence that is disparate to others similarly situated. The Court chose to apply Guideline 2M5.2 rather than 2M5.1, even though semi-closed rebreathers are not specifically listed under the United States Munitions List. 22 CFR Part 121.1. Sotis requests review of the trial court's decision to use 2M5.2 to calculate the Defendant's base level offense *de novo.*

The plain language of the two sections shows that 2M5.1 is the more applicable section to the facts of this case. The base level offense for Sotis should have been a 14 under section 2M5.1. The error is not harmless, since adjusting the base level would put Sotis at a guideline range below the sentence he received. Sotis' sentence is also disparate to others similarly situated.

## ARGUMENT

### I
### COUNTS 1, 2 AND 3 ARE NOT SUPPORTED
### BY SUFFICIENT EVIDENCE

**Standard of Proof**. Convictions not supported by sufficient evidence violate the mandate that all criminal charges must be proven beyond a reasonable doubt. *In re Winship*, 397 U. S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Id.* The Eleventh Circuit reviews *de novo* whether there is sufficient evidence to support the jury's guilty verdicts, reviewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility evaluations in favor of the verdict. *United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011).

### A. The Government Charged but Failed to Prove that the rEVO III Rebreathers Were Closed-Circuit Rebreathers Creating a Fatal Variance

The government charged in the indictment that the rEVO III's were closed-

14

circuit rebreathers, citing to ECCN 8A002.q.1.    (ECF 3, Indictment, par. 5,9; Appellant's App. Vol. I, p. 44, 46-48). These paragraphs were incorporated by reference into every charge. Thus, it was incumbent upon the government to prove that rEVO III's were closed-circuit rebreathers for all counts.

At trial, the government discussed in general rebreathers, but never established what the rEVO III's were in terms of a closed circuit, semi-closed circuit or open. These classifications are critical to navigating the regulations and determining their specifications for export.

Wagner described the rebreathers but did not say if they are closed, semi or open. (Tr.Vol. I, p 96). Michael Tu, senior engineer, and export administration, testified that he decided if a license was required, based on information he received that the items were closed-circuit rebreathers and micro circuit rebreathers, or closed-circuit rebreathers and semi-closed-circuit rebreathers. (Tr.Vol. I, p. 192-198). He explained that closed-circuit rebreathers will not produce any bubbles from the diver, exhale, but semi-closed-circuit rebreathers will operate under similar principles, however, there will be some exhalation gases, meaning bubbles. (Tr.Vol. I, p 198). He discussed rebreathers in general but did not identify the rEVO III as a closed-circuit rebreather. (Tr.Vol. I, p 196- 205). In making the determination for a license in general, Tu stated that he looks at what the item is, whether it is controlled by the CCL, the end use, and the end user. (Tr.Vol. I, p 195). Tu attributed an (ECCN of 88002.q, which pertains to

both closed and semi-closed-circuit rebreathers. (Tr.Vol. I, p 199). Yet, Tu failed to discuss the other components to the analysis, that is, who the end user was, the end use, and the specifications of this rebreather as to what made it suitable for military use. As discussed herein, having an ECCN number is not the end of the licensing analysis.

Robotka, part owner in Add Helium, testified that Emilie Voissem was a rEVO diver and very knowledgeable about the equipment. (Tr. Vol. III, p. 17). Voissem testified that she was trained on the rEVO III's, but had limited knowledge on what would be considered military grade. (Tr. Vol. IV, p. 14). She stated that military grade rebreathers were "a lot more compact and confined." (Tr. Vol. IV, p 14). Voissem testified that Robotka was certified as a rebreather instructor for a different unit (Tr. Vol. IV, p 17-19).

Robotka testified as a government witness and had cooperated with Wagner. He even agreed to be wired and attempt to gather evidence on Sotis (Tr. Vol. III, p 182), Although he testified that rebreathers are known as CDR, closed loop rebreathing systems, and were "stealth-oriented," (Tr. Vol. III, p. 166), he admitted on cross examination that the rEVO put out bubbles on the ascent (Tr. Vol. III, p. 112). He also explained that solenoid valves make a clicking sound to allow gas to go into the rebreather and that some rebreathers do have a solenoid valve. He did not know if rEVO's did (Tr. Vol. III, p.126). Finally, he admitted on cross that the military was looking at "this particular model," the rEVO "sold to Obama," that it was reviewed by

16

the Navy Experimental Dive Unit (NEDU) for use in the military, but had failed (Tr. Vol. III, p. 125-127).

## B. Proving a Closed-Circuit Rebreather as Charged was Critical Since Rebreathers Included in the Commerce Control List under 8A992 Did Not Require a License to Ship to Libya

The indictment stated that "[i]tems categorized under ECCN's required a license for export based on a specific reason for control" and that "[g]oods and technology controlled for National Security reasons required a license for export to countries including Libya." The indictment was incorrect and incomplete. Testimony at trial was likewise misleading, incomplete, and insufficient to establish this critical requirement of the absolute need for a license in this case, much less, Sotis' foreknowledge of that fact.

As a matter of law, not all items on the CCL and assigned an ECCN require a license, as was alleged in the indictment and as the government argued to the jury. In particular, not all rebreathers addressed in the CCL are restricted for shipment to Libya. There are many exceptions to the licensing requirements and shipments to Libya are not excluded from these exceptions. The government failed to show the need for a license for rEVO III's because the government failed to distinguish its qualities and characteristics from rebreathers included under the CCL but not restricted in their export to Libya.

Determining whether a license is needed for the export of a particular item is no

small feat. Notwithstanding, the government misrepresented the simplicity of the license decision-making process and in so doing, failed to demonstrate that anyone in government had gone through the analysis to establish correctly what type of item rEVO III was, whether an exception would apply, whether it was in fact a "dual-use" item, and if so, whether the user of the item and its use were prohibited. The government failed to establish in fact whether exports of rEVO III to Libya was illegal.

An overview of the licensing regulations demonstrates this point. Closed and semi-closed-circuit rebreathers are specifically listed on the CCL at category 8, section 8A002q, with q.1 pertaining to closed circuit rebreathers and q.2 pertaining to semi-closed-circuit rebreathers.  The full text of Category 8 of the CCL is set forth in Appellant's Appendix (Appellant's App.Vol. I, p. 76). Sotis was charged under subsection 8A002 q.1, pertaining specifically to closed circuit rebreathers. (ECF 3, Indictment, par. 5,9; Appellant's App. Vol. I, p. 44, 46-48).[4]  Under "Related Controls"

---

[4]   To emphasize the importance of the government in proving its case as set out in the indictment,  the court at sentencing relied on  evidence under q.1, which would have required proof of closed-circuit rebreathers:

THE COURT: The paragraph reads: Items categorized under ECCNs require a license for export based on a specific "reason for control." The "reason for control" in turn determined the countries to which the export of an item required a license. Goods and technology controlled by foreign national security reasons required a license for export to countries including Libya. All items categorized under ECCN 8A002.Q.1 were controlled for export for, among other reasons, national security reasons. 15 CFR Part 774 Sup No. 1, entry for ECCN 8A002.Q.1 (closed-circuit

for "self-contained underwater breathing apparatus" not controlled by 8A002 or released for control by the 8A002.q, there is a cross reference to 8A992 (Vessels, marine systems, or equipment, not controlled by 8A001 or 8A002 and "specially designed" "parts" and "components" therefor, and marine boilers and "parts," "components," "accessories," and "attachments" therefor). (Appellant's App Vol. I, p.72).

This cross reference to 8A992 addressing underwater equipment is important. Items listed under 8A002 are controlled for NS (national security) and AT, (anti-terrorism). *See*, 15 CFR 738.2.(d)(2)(ii). According to the Country Chart (Appellant's App. Vol.I, p 96-104), as of November, 2016, Libya was controlled only with regard to the NS classification, not the AT classification. As to "other underwater equipment" listed under 8A992, it was only controlled for AT. Thus, no license would be required to ship to Libya.

The absence of any controls for Libya under the generalized list of underwater equipment (8A992) is significant because the rEVO III's were rejected for military use. The government argued at sentencing that even though these rebreathers were rejected for military use, they could nonetheless be used in training. (Sent. Tr. Jan 11, 2022, p. 33,39, 41, 42). So could toy scuba gear. So could an open circuit rebreather, not

_____

rebreathers). So that basically says these rebreathers were on the Commerce Control List. (Tr.Sent. January 11, 2022, p. 14).

restricted for shipment to Libya.   Thus, distinguishing the rEVO III as a closed-circuit rebreather and distinct from the more general section under 8A992, which applies to other types rebreathers not restricted for shipment to Libya, was critical.

According to section 15 CFR, part 738.4 (a)(2)(ii)(A), even if an item is listed on the CCL and the Country Chart, an exception may apply to exempt the transaction from the need for a license.  The Exceptions listed in 15 CFR Part 740 of the EAR (Appellant's App. Vol. I, p.92) must be consulted to determine whether a person may use any of the available ECCN-driven License Exceptions, rather than apply for a license.

Section 740.20 is the section called the "License Exception Strategic Trade Authorization" (STA).  (Appellant's App.  Vol. I, p. 94).  STA is referenced in the Category 8, section 8A002, stating: "STA: License Exception STA may not be used to ship any commodity in 8A002.b, h, j, o.3, or p to any of the destinations listed in Country Group A:6 (Appellant's App. Vol. I, p. 72).  Subsection q under 8A002 is not listed, meaning that an exception under STA could be granted under 8A002.q, the section charged in this case.

At trial the government took the position that rEVO III's  were "dual-use." (Tr.Vol. II, p. 123-124). The BIS within the U.S. Department of Commerce is responsible for regulating the export of most commercial items, often referred to as "dual-use" items which are those having both commercial and military or proliferation

applications. (Appellant's App.Vol., II, p. 115).  As stated on their website, relatively few exports of dual-use items require obtaining an export license from BIS prior to shipment. Dual- use export licenses are required in certain situations involving national security, foreign policy, short-supply, nuclear non-proliferation, missile technology, chemical and biological weapons, regional stability, crime control, or terrorist concerns. The license requirements are dependent upon an item's technical characteristics, the destination, the end-use, the end-user, and other activities of the end-user.  The "dual-use" analysis requires a person to "screen the customer" to determine whether the customer is on the "Denied Persons List," the "Unverified List," the "Entity List," the "Specially Designated Nationals List, "or the "Debarred List." (Appellant's App. Vol. I, p. 115-116).

The government did not present a dual-sue analysis that could establish the need for a license, and the evidence that was presented did not suggest the use or the user were a threat to the US. The  government presented evidence that the end user to be CODI Group-Submarine Services, Ex 8C (Appellant's App. Vol. II, p. 1-2), engaged in the business of underwater photography.  (Tr. Vol. II, p. 158).  Tu, who concluded that a license would have been required, failed to discuss these aspects of the "dual-use" analysis. In fact, he was not asked or questioned regarding them at all.

A witness' claim of authority to classify any item as a "defense article," without revealing the basis of the decision and without allowing any inquiry by the jury, would

create or allow the sort of secret law that *Panama Refining Co. v. Ryan*, 293 U.S. 388,

55 S. Ct. 241, 79 L. Ed. 446 (1935) condemned. A regulation is published for all to

see.  As explained in the Seventh Circuit in *United States v. Pulungan*, 569 F.3d 326

(7 Cir. 2009):

People can adjust their conduct to avoid liability. A designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian regimes. Government must operate through public laws and regulations.

*citing*, *United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009). Thus, the government

must prove, and not just assert, that a particular item is what the government alleges

that it is, that Sotis knew its characteristics, knew a license was required, and willfully

disobeyed the law. The government did not prove these things.

In this case, Alberto Puras with US customs and Border Protection testified that

he seized the rebreathers on October 25, 2016 for the failure to acquire a "PSB61" (sic)

license (Tr. Vol. I, p. 173), which appears to be a DSP-61 license. (Appellant's App. I,

p. 137). The DSP-61 pertains to "defense articles."  (Appellant's App. I, p. 137). The

rEVO III's  were rejected for military use.  (Tr.Vol. III, p. 125-127). The government

never proved that they were "military articles" requiring a DSP-61 license.  In this case,

no reasonable jury could infer that a DSP-61 license was required in this case because

that license only pertains to military articles.

By the time Sotis was sentenced, the government did not challenge or present

any contradictory evidence that the rEVO III's did not have a military application, except perhaps in training.   (Sent. Tr. Jan 11, 2022, p. 33,39-42).   Thus, the government never established the rEVO III was indistinguishable from simpler, open-circuit, underwater equipment that was not restricted for export to Libya.

### C. Prejudicial Evidence on Closed-Circuit Rebreathers Was Not Objected to Because the Government Had Alleged Illegal Export of Closed-Circuit Rebreathers

The government never established that the rEVO III's rebreathers are closed-circuit rebreathers. In this regard, the government failed to prove its case on all counts, as described in the indictment.

This variance in this case was fatal. The indictment described that

[a] rebreather is an apparatus that absorbs the carbon dioxide of a scuba diver's exhaled breath to permit the rebreathing (recycling) of each breath. This technology produces no bubbles, thereby concealing the diver's activities from those on the surface, and allowing a diver to stay underwater longer compared with normal diving equipment. (ECF 3, Indictment, par. 9).

 The government presented ample evidence at trial as to the dangers of closed-circuit rebreathers, describing them as "stealth" and explaining how they might be used to commit a terrorist attack. Specifically, Brent Wagner testified as follows:

Q: …And did you provide a specific example of what could happen if it (rebreathers) ended up in the wrong hands?
A. I did.
Q. And what was that example?
A. So the example I gave to them was for cruise ships, which is a perfect example. If someone wanted to, a terrorist organization, wanted to do something with a cruise ship, it would be very easy with this technology to utilize the scooters and the rebreathers to go underwater, weld something to the bottom, weld something to the bottom of the

cruise ship, whether a bomb or anything, and then be able to escape very quickly with this technology, and pretty much be undetected.

(Tr.Vol. I, p. 58). Yet, the rEVO III's were rejected for military application and were incapable of performing in the "stealth" manner described to the jury. (Tr. Vol. III, p. 127). The jury was very much prejudiced by the testimony regarding the potential danger of closed-circuit rebreathers, an item more dangerous than the rEVO III's. The government did not present an expert testimony on the military use of the rEVO III's, although Wagner described himself as a "military history buff." (Tr. Vol. I, p 52).

At sentencing, the defense called Chauncey Brewster Chapman III, who designed and built test systems for US Navy standards. He explained that "normal diving" produces bubbles and makes a lot of noise. Every diver begins on open circuit devices, allowing only 30 minutes under water. Rebreathers allow for extended time under the water, depending on the design and the unit. Fully closed-circuit rebreathers do not produce bubbles, while semi-closed units produce bubbles. With a semi-closed unit, when someone ascents, a tremendous amount of gas is dumped. The rEVO is considered by the military to be a semi-closed rebreather. Rebreathers containing a magnetic solenoid will click and has a very distinctive sound. Closed-circuit rebreathers, specifically the Mark 25 he described, does not have a solenoid. If a rebreather has a "magnetic signature" it cannot be used in disarming mines. The Mark 25 was specifically designed for use in anti-magnet mine warfare. The rEVO III's

24

produce bubbles and make noise and, he believed, contained a lot of steel. He explained that ferrous metals will trigger a magnetic sensor. Although he could not specifically say whether the US military utilizes rEVO III's, he did say that the US Military invited "a number of recreational rebreather manufacturers to come in, train a group of Navy divers, and leave some units for revaluation." He stated that the rEVO "was not accepted for use by the fleet." He stated that the rEVO III's were not useful in active military missions, although it could be used to train a diver. On cross, he stated that semi-closed-circuit rebreathers are not designed as stealth units. (Tr. Sent. January 11, 2022, p. 22-40).

The government never called anybody to rebut Chapman's testimony, but did include an affidavit of James J. Marsh (ECF 148, Exhibit 1 thereto), which stated that the units had a military application because they could be used in training, and the government argued that basically that was good enough. (Tr. Sent. January 11, 2022, p. 42).

The problem with arguing that simple training maneuvers satisfied the term "dual-use" is that it does not satisfy the law. "Dual-use" a term of art specifically defined under the code of federal regulations, and it does not include training. [5] as the

_____

[5] 15 CFR § 730.3 "Dual use" and other types of items subject to the EAR.

The term "dual use" is often used to describe the types of items subject to the EAR. A "dual-use" item is one that has civil applications as well as terrorism and military or weapons of mass destruction (WMD)-related applications. The precise description of

definition shows, the item itself must have intrinsic and inherent danger, "terrorism and military or weapons of mass destruction (WMD)-related applications" or "items with both civil and military, terrorism or potential WMD-related applications." See footnote 4 below.   The definition does not include something that can be used by someone to train for the use of something else. If so, then anything meets the definition.

The Fifth Amendment guarantees that a defendant can be convicted only of crimes charged in the indictment. *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015). This principle ensures that the defendant receives proper notice of the charges against him and has an opportunity to present a defense. *Id*. A material variance requiring reversal occurs "when the facts proved at trial deviate[d] from the facts contained in the indictment" and the defendant suffered substantial prejudice as a result. *Id*.

The standard of review for whether there is a material variance between the allegations in the indictment and the facts established at trial is twofold: first, whether a material variance did occur; and, second, whether the defendant suffered substantial

---

what is "subject to the EAR" is in § 734.3, which does not limit the EAR to controlling only dual-use items. In essence, the EAR control any item warranting control that is not exclusively controlled for export, reexport, or transfer (in-country) by another agency of the U.S. Government or otherwise excluded from being subject to the EAR pursuant to § 734.3(b) of the EAR. Thus, items subject to the EAR include purely civilian items, items with both civil and military, terrorism or potential WMD-related applications, and items that are exclusively used for military applications but that do not warrant control under the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 et seq.).

prejudice as a result. *United States v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999). A variance in essence is "one form of challenge to the sufficiency of the evidence." *United States v. Jenkins*, 779 F.2d 606, 616 (11th Cir. 1986). "A 'variance' occurs when the evidence at trial establishes facts materially different from those alleged in the indictment." *United States v. Caporale*, 806 F.2d 1487, 1499 (11th Cir. 1986). To find substantial prejudice, the Eleventh Circuit considers whether "the proof at trial differed so greatly from the charges that appellant was unfairly surprised and was unable to prepare an adequate defense." *United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997).

The prejudice in this case was not harmless.  In the world of export licensing, the exact nature of the item in question is critical, and in this case, pivotal.  Trial counsel did not object to testimony regarding closed-circuit rebreathers because it was an element of the indictment.  It was the government's burden to prove it.   If Sotis had been charged with exporting a semi-closed-circuit rebreather, all evidence regarding the more dangerous  closed-circuit rebreathers would have been excluded as highly prejudicial.  Instead, it was relevant to the offense, as charged.  By analogy, the  trial court would not have permitted the government to charge a murder, allow a defense to murder to be presented, then allow a conviction  on murder  to stand if only a battery were proven. The government proceeded on an indictment that charged Sotis with exporting closed-circuit rebreathers, and presented very compelling and prejudicial

evidence on the dangers of closed-circuit rebreathers to the jury. If this evidence was properly before the jury, as prejudicial as it was, the government was required to prove their case, as charged.

At sentencing, it was established that rEVO III's produce bubbles, make noise, probably include magnetic components that could detonate explosive devices, and were rejected by the military. (Tr.Sent. January 11, 2022, p. 23-40). A closed-circuit rebreather is a far more dangerous item than the rEVO III's. The evidence could not be objected to at trial, as the government took on the task to prove it. Thus, the government's failure to prove it is fatal. All three counts must be reversed.

### D. Sotis and Voissem Had a Good Faith Basis for their Belief That the rEVO III Rebreather Was Not Dual Use Since It Had Been Rejected by The Military

The IEEPA makes it unlawful for a person "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). A person who "willfully conspires to commit" such an unlawful act is subject to criminal penalties. *Id.* § 1705(c). The conduct must be willful. "Willfulness" under 50 USCS § 1705 requires government to prove beyond reasonable doubt that defendant acted with knowledge that his conduct was unlawful, but not that defendant was aware of a specific licensing requirement. *United States v. Mousavi*, 604 F.3d 1084, 2010 U.S. App. LEXIS 9213 (9th Cir. 2010).

As shown above, determining whether a license is needed for the export of a

28

particular item is no small feat. It is for this reason that the statute requires a ***willful*** violation. A willful violation was not shown in this case.

Of critical importance in this case was the actual knowledge possessed by Add Helium that the rEVO III's had been rejected for military application. Their belief that the rebreathers were for recreational use only was based on their actual knowledge of that fact. They did not bury or misrepresent or avoid critical facts in their discussions with Diana and Muhammad, as represented by the government.

The government did not present its case in chronological order, beginning its presentation instead with the testimony of Brent Wagner, who suggested that Sotis and Voissem pivoted after he met with Add Helium on August 4, 2016, and thereafter made the decision to use Ramas as an "intermediary" to avoid the licensing requirements. (Tr.Vol. 1, p. 95). Wagner described Ramas' role as "handling all the information as far as the payment and logistics of the shipment with Add Helium. (Tr.Vol. 1, p.95).

Examining the evidence in chronological order shows that days before Wagner met with representatives of Add Helium on August 4, 2016, Emilie and Sotis had made the decision to not ship and just have their domestic customer, Ramas make the decision on the licensing requirements. Ramas made the ultimate decision whether a license was needed, based on their superior experience in shipping in general, and in shipping to Libya in particular, and also on their independent research on the product, the end user, and the purpose for the equipment. (Tr. Vol. II, p.112-160). They also

relied heavily on their freight forwarder, who also had extensive experience and with whom they had worked for years. (Tr. Vol. II, p. 119, 160).  Diana and Muhammad each thought Voissem at Add Helium was "incompetent."   (Tr. Vol. II, p. 81, 145).

The government's case demonstrated an undisputed chronology:

- April 5, 2016--Ramas prepared a commercial invoice for Abdulla Elbanani (sic) at "CODI Group- Submarine Services" located in Libya for certain "diving equipment-recreational." Ex. 8C (Appellant's App.Vol. II.  p.1-2).

- April 5, 2016 --Sotis directed Voissem in an e mail to prepare an invoice for Bensadik (a resident of Virginia with dual US/Libyan citizenship) for the rebreathers. Ex. 12A (Appellant's App. Vol. II.  p. 3-11).

- April 5, 2016-- Add Helium prepared an invoice for Ramas for a number of items, including four rEVO III rebreathers, with no charges for shipping: "To Be Determined" Ex. 7A (Appellant's App. Vol. II.  p. 12-14).

- April 20, 2016-- Add Helium received a wire transfer from Ramas. (Ex.  7D) and on May 3, 2016, Muhammad two separate payments.  Ex. 7E and Ex. 7F (Appellant's App. Vol. II.  p. 15-20).

- May 9, 2016--Add Helium invoiced directly Ramas for $35,340.  Ex.  7C (Appellant's App Vol. II.  p. 21-22).

- June 3, 2016 --Sotis sent an e mail to Simon Nadim regarding arrangements for an instructor in Libya, and in the e mail, acknowledged that Bensadik is the

purchaser of the rEVO units, "Osama will be bringing them to Libya." Ex. 12F (Appellant's App. Vol. II.  p. 25-28).

• July 7, 2016 --a wire in the amount of $22,923 was paid by Ramas.  Ex. 7H, 12K (Appellant's App Vol. II.  p. 29-36).

• July 27, 2016-- Global Forwarding alerts Voissem the Libya shipment "might be more complicated than originally thought. "Ex. 12L (Appellant's App. Vol. II. p. 37-46).

• July 28, 2016-- Voissem notified Sotis regarding Global Forwarding concerns with shipping to Libya and Sotis responds with looking into the requirements to "see how time consuming it might be, then we can make a determination." Ex. 12O (Appellant's App. Vol. II.  p. 47-49).

• July 29, 2016--Voissem sends an e mail to Diana, asking "do you have experience shipping items by air freight to Libya? If so, perhaps your shipper may be the better choice?"  Voissem explained, "The products being shipped are considered by us to be recreational/technical diving equipment. I am unaware regarding the SU certificate but will see if I can find out further. Thank you for the additional information regarding Libya. I should know more when I speak to them. If the items are able to be sent, a harmonized code will have to be identified for each item. Please let me know if there is anything I can do to help speed this process back up." Ex. 12S (Appellant's App. Vol. II.  p. 53-58).

31

- July 29, 2016-- Voissem sent an e mail to Mohammad telling him that their shippers put an alert on the shipment because it was going to Libya, and that she had been working to get a "more definitive answer regarding the shipment" and "if the items could in fact be shipped." She indicated that it was the first time she had had "anything like this happen" and they were working to resolve it. She also stated that "we may need your assistance regarding the shipment or may need documentation regarding the purpose of the equipment." Ex. 12BB (Appellant's App. Vol. II. p. 59-71).

- July 29, 2016-- Diana sent an email to Voissem stated that they usually ship but had the understanding that Add Helium would ship. Diana stated that "usually the Dept of Commerce/Export.gov <http://export.gov/ would require a special license if the commodity is considered sensitive, high technology (examples of products that require export licenses are electronics, sensors and lasers, space satellite equipment, navigation equipment and microorganisms)." Diana then inquired: "Is your diving equipment considered special high tech or can be deemed as dual use? Was an SLI issued to the shipper and by who?" Diana then explained that "there are certain restrictions to Libya but it is not considered a sanctioned county such as Iran, Sudan, etc." She informed Voissem that "the consignee in Libya is a private business and not on the OFAC's Blocked party List." She asked to be informed as to any documentation that might be required to assist in the shipment.

Ex. 12BB (Appellant's App. Vol. II. p. 70-71).

• July 29, 2016 -- e mail from Emilie Voissem to Peter Sotis, stating that "(Diana) seems to have knowledge regarding shipping information etc. for his company "and stating that (someone at) the "Bureau of Industry and Security and Office of Export enforcement… did tell me that shipping to Libya was probably not going to happen because of how volatile it still is." The email also stated that "Shawn (Robotka) also found a document that was issued in April by the president basically banning export of goods and stopping travel from the US." Ex. 12T (Appellant's App. Vol. II. p. 75-78).

• July 30, 2016 -- Peter responded, suggesting all shipments to Libya are banned, and indicates he does not to want to make an illegal shipment. He states: "Ok, if the president has banned all shipments to Libya, they are going to have to find another route or handle it from here. We do not need trouble from the government for making an illegal shipment. I think its time Osama and Mohammed manage this problem and let us know how they intend to receive *their goods* as we can't ship to Libya (*emphasis supplied*)." Ex. 12U (Appellant's App. Vol. II. p. 80-84).

• August 1, 2016-- Voissem forwards to Diana a link

https://www.treasury.gov/resource-center/sanctions/Programs/Documents/libya_eo_20160419.pdf

(an Obama Executive Order), stating, "It is looking like we may not be able to ship to Libya…," then asking "if you have other information or knowledge in the meantime please let me know."  Ex. 12BB (Appellant's App. Vol. II. p. 70).

- August 1, 2016-- Diana responded to Emilie's concerns about a total ban on shipments to Libya by stating, "I don't believe that this president declaration applies to us because our customer is not on the blocked party list. This declaration applies to individuals that have property, assets or bank accounts in the US that are on the blocked party list or individuals with terrorist ties and against the Libyan government. We are not importing oil or other sanctioned items or exporting technical equipment or weaponry that could be used in a dual use manner. Those would require special permission and licensing. "Ex. 12BB (Appellant's App. Vol. II.  p. 69).

- August 1, 2016-- Muhammad stated, "Please let us know if you want us to handle the shipping through our shipping companies. If that is the case, we will need the codes so we can generate the paperwork. In addition, we will need you to refund and wire the shipping cost ASAP to our company account so we can do the booking (We have to pay upfront for air shipping). Wire information attached."  Ex. 12BB (Appellant's App. Vol. II.  p. 66).

- On August 1, 2016-- Voissem stated that it "may be appropriate and in the best interest of time for the shipping to go through you. We do apologize regarding

this shipping issue; however it is out of our hands and there was no indication from our shipping company of any issues or concerns until they went to book it. Voissem inquired:" Would you still want the items to be picked up here at Add Helium with your shipping company?" Ex. 12BB (Appellant's App. Vol. II. p. 66).

• August 2, 2016-- Mohammad indicated Ramas had assumed responsibility for the shipping, stating: "Can you tell us when do you think you will be done with the codes so we can do the booking. We would like to have the goods picked up this Thursday if possible so we do not loose (sic) another week (Providing we can arrange for booking this week). We would arrange for the shipping company to pick up the goods from your store. Ex. 12BB (Appellant's App. Vol. II. p. 65).

• August 1-2, 2016—Following contact initiated by Voissem, Wagner arranged to meet with Add Helium on August 4. (Tr. Vol. I, p. 117).

• August 3, 2016-- Voissem communicated with Global Forwarding and indicated that "the customer is going to take over." Ex. 12Z (Appellant's App. Vol. II. p. 86).

• August 4, 2016-- Wagner meets with Add Helium personnel at the facility.  (Tr. Vol. I, p. 45)

• (Undated) the packing list for shipping was prepared by Ramas. Ex. 8D (Appellant's App. Vol. II. p. 92).

35

• August 9, 2016-- an e mail from Voissem to Diana Zaghab indicating that the crates had been picked up from Add Helium.  Ex. 12HH (Appellant's App. Vol. II.  p. 94-96).

• August 12, 2016-- the air cargo manifest described the nature of the goods as "Diving Equipment-Recreational." Ex. 8E (Appellant's App. Vol. II.  p. 98), as had the original order that came in to Ramas by their customer in Libya.  Compare Ex.  8C (Appellant's App. Vol. II.  p. 1-2).

• August 17, 2016, Wagner received a preliminary determination on the license he had requested on behalf of Add Helium, called them,  and spoke with Voissem and Sotis. (Tr.Vol. I, p. 69-71)

• August 24, 2016-- Wagner had a second meeting at Add Helium with personnel (Tr. Vol. I, p. 75)

• August 25, 2016-- Wagner sent a subpoena in reference to "all shipment made to Libya, either directly or through means of transshipping, from 8/30/2011 to present.

• August 26, 2016-- Strike Aviation returned the items Exs. 4- 6 (Appellant's App. Vol. II.  p. 104-111).

The details of dual-use analysis, that is, where the item will be shipped, what the item is, whether it is controlled by the CCL, the end user, and what the item will be used for, important details  described by Tu at trial (Tr.Vol. I, p 195), were discussed

in these e mails. The e mails show that those details were flushed out in the process of reaching the conclusion by Diana that no license was required.   These e mails demonstrate a more through discussion about the factors of dual-use analysis than the government's evidence at trial.  The customer requested "diving equipment-recreational" to begin with (Ex. 8C). Voissem considered the equipment recreational, and had a good faith basis to believe that, as discussed herein. (Ex. 12 S).  Diana stated that the end user, the consignee in Libya, was a private business and not on the OFAC Blocked Party List (Ex. 12BB, Appellant's App. Vol. II, p. 55). Diana concluded they were not shipping anything of dual-use and did not need a license. (Appellant's App. Vol. II, p. 55).

The communications show that the parties were not trying to avoid the licensing requirements. Rather, they were trying in good faith to figure out what they needed to do. Voissem was overly cautious and ready to just say, no shipment to Libya at all, based on the Executive Order of President Obama given to her by Robotka, but was told by Diana that the document did not apply and in fact, it was established at trial that Diana was correct. (Tr. Vol. II, p 194-195). Voissem's overly cautious concerns were proven to be unfounded, in that the Executive Order in fact did not apply, as conceded by the government. (Tr. Vol. II, p. 195). Rather than not being willfully defiant to the licensing requirements, Voissem was overly concerned about things that did not matter.

### E. Sotis and Voissem Did Not Commit a Conspiracy

The elements for proving a conspiracy under 18 U.S.C. § 371 are: (1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement. *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). Mere planning or preparation to engage in a crime is not enough to constitute a "substantial step." *United States v. St. Hubert*, 909 F.3d 335,  351 (11th Cir. 2018). Rather, to take a substantial step, the defendant must engage in "objectively culpable and unequivocal acts toward accomplishing the crime." *Id*.

The only understanding  Sotis and Voissem had was that they were in over their head on the decision of whether a license as needed, so they made the decision not to ship. After all, Voissem testified that the owner of the items was Osama Bensadik and Ramas (Tr.Vol. IV, p.  34-37). Robotka testified that " this particular model, the rEVO … was "sold to Osama [Bensadik]"  (Tr.Vol. III, p. 125).   Sotis and Voissem sold the items to Ramas· in a domestic sale. Ramas picked up the items from Add Helium.  Sotis did not ship, and Voissem did not ship. They did not "transship" to another country  to avoid a direct shipment to  Libya (Tr.Vol. I, p. 49), and they did not "transfer" to another party to do their "dirty work," as Wagner described it. (Tr. Vol. I, p. 50). Ramas assumed the responsibility to determine if a license was needed and to export the items. Diana determined no license as required, based on their independent analysis. The

38

Zaghabs were never prosecuted and testified under grants of immunity. (Tr. Vol. II, 85-103).

Sotis and Voissem were not trying to avoid the law, nor did the government firmly establish that a license was needed. Sotis and Voissem did not pivot, as suggested by Wagner after the meeting on August 4, 2016. In fact, the email communications clearly demonstrate that the decision to allow Ramas to just ship their own products was made at the end of July, 2016. Their decision to allow someone more knowledgeable to make the decision was an acknowledgement of their inadequacy and reliance on the representations made by the Zaghabs, who had extensive shipping in general, and extensive experience shipping to Libya in particular. A person who hires an accountant because he does not understand the Internal Revenue Code has not, by relying on superior knowledge, committed tax evasion, even if the accountant makes a mistake. Looking at the light most favorable to the government, Diana made a mistake and Sotis and Voissem made a mistake to rely on her. That is a far cry from willfulness.

If anybody needed a license it was Ramas, exporting from the US to Libya. According to the BIS, a division of the US Department of Commerce, the primary responsibility to ensure the export complies with the Export Administration Regulations (EAR) is the exporter. (Appellant App. Vol. I, p.121-126). Sotis did not shipped overseas. He arranged for pick up by a domestic company, his client, Ramas.

Contrary to the government's efforts at trial, Diana did not make her mistake, if there was one made, based on misrepresentations from Voissem, who had a good faith belief that the rebreathers were not dual-use. While the government may have established that some rebreathers have applications in the military context, the government failed to establish that the rEVO III's had a military application, such that they were in fact "dual use."

Robotka was 20 percent owner in a business that specialized in the sale of rebreathers. This knowledge of the nature and capabilities of the rEVO III would have been known by Voissem, who was specifically trained in the use of this particular model, and Peter, who was an expert on a couple of different rebreathers. (Tr. Vol. III, p. 16). Their good faith belief that this particular model was not "dual use" and was only for recreational use had a basis in fact, and certainly provided a good faith belief in communications of that nature to the Zaghabs regarding the recreational use of this model. The government's efforts to paint Voissem and by proxy, Sotis, as having misrepresented the dangerous nature of the rEVO III is simply not supported by the Record.

## II
## THE GOVERNMENT ELICITED TESTIMONY THAT INVADED THE PROVINCE OF THE JURY AND DENIED SOTIS A FAIR TRIAL

**Standard of Proof**. Regarding any issue for which the government argues or the court concludes that trial counsel did not properly preserve the error, the plain error

doctrine applies.  *See, United States v. Duncan*, 400 F.3d 1297, 1301 (11th Cir. 2005).

Trial counsel did not object to one of two witnesses presented by the government, whose testimony invaded the province of the jury. Michael Tu testified that he decided a license was required,  based on  information he  received  that the items were closed-circuit rebreathers and micro circuit rebreathers, or closed-circuit rebreathers and semi-closed-circuit rebreathers. (Tr.Vol. I, p. 192-198).  Tu did not go through the analysis, or give the jury the facts upon which to make that determination themselves.   Trial counsel did not object.

Even more devastating was the opinion testimony of Wagner regarding willfulness, to which the defense did object:

> (Govt): There were questions on cross-examination about whether you had seen other cases involving rebreathers and other export violation cases. Compared to those other cases, have you ever seen a case where there was this much ***willfulness on the part of the defendants***?
> MR. UDOLF: We object.
> MR. MOSS: Same grounds.
> THE COURT: You opened the door. Overruled.
> THE WITNESS: I have never seen this much knowledge in a case like this.

(Tr.Vol. I, p 166).  Discussing facts does not open the door  or waive a constitutional right to trial by jury. The court erred in overruling the objection and allowing the witness to testify on the issue of willfulness, the ultimate issue for the jury and the scienter requirement that  makes licensing omissions  a crime.

 This error denied Sotis a fair trial and denied him his constitutional right to a

trial by jury. Offering an opinion  on  intent to lie or an opinion on credibility improperly invades the province of the jury who is to make all credibility determinations. *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996).

Of particular significance is the Eleventh Circuit case, *United States v. Fuentes-Coba*, 738 F.2d 1191  (11 Cir. 1984), not only because it addressed this issue, but did so in the context of  allegations that the defendant had illegally chartered flights and transported goods to Cuba. The court applied plain error analysis and concluded that the province of the jury had not been invaded because the testimony did not unfairly undermine the defendant's specific intent defense, and instead provided the jury with a valuable perspective.  402 F.3d at 1197. The court additionally concluded that  the testimony did not invade the province of the court in its determination of the applicable law, or the jury in its evaluation of the facts  in light of that law.  The court relied upon *Federal Aviation Admin. v. Landy*, 705 F.2d 624  (2 Cir. 1983) where the court reasoned that opinion testimony was property excluded:

Appellants objected to exclusion of opinion testimony by one witness, a former FAA District Office Supervisor, who would have testified as to industry practice and FAA policy concerning operational control of a leased aircraft under Part 91, as reflected in Advisory Circulars. The testimony was properly excluded for two reasons. First, questions soliciting the former FAA employee's understanding of the meaning and applicability of Part 91 and Part 121 EARs would invade the province of the court to determine the applicable law and to instruct the jury as to that law.

 705 F,2d at 632.  The court also relied upon *Marx & Co. v. Diners' Club, Inc*., 550 F.2d 505 (2 Cir. 1977) ("It is for the jury to evaluate the facts in the light of the

applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum.").

The ultimate issues --- whether a license was in fact required for these particular rEVO III's, proven not by someone's summary opinion but by the evidence on important factors, whether Sotis knew these factors required a license, and whether he willfully violated the law---were not left to the jury. The government elicited opinion testimony on those issues. The jury was told what to think. The constitutional right to a jury trial embodies "a profound judgment about the way in which law should be enforced and justice administered." *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968). Sotis was denied his Sixth Amendment right to trial by jury, Due Process of law, and a fair trial, requiring a reversal of all his convictions.

## III

### THE TRIAL COURT MISAPPLIED THE GUIDELINES RENDERED A SENTENCE THAT IS DISPARATE TO OTHERS SIMILARLY SITUATED

**Standard of Proof**. On appeal, the Eleventh Circuit reviews the trial court's factual findings at sentencing for clear error and its application of those facts to the Sentencing Guidelines *de novo*. *United States v. Guevara*, 894 F.3d 1301, 1311 (11th Cir. 2018). The Court erred in its determination that the 2M5.2 was the proper section of the Guidelines to determine a Base Level Offense. (Tr. Sent. January 12, 2022, P.

43

42).

The Eleventh Circuit has adopted the principles the "rule of lenity" in issues involving competing guideline sections.  The rule of lenity applies if a statute - in this instance, a sentencing guideline - is ambiguous. *United States v. Johnson*, 155 F.3d 682, 685 (11th Cir. 1998). In construing the Sentencing Guidelines, the Eleventh Circuit first begins with its language, considering both the text of the guidelines and the accompanying commentary. *United States v. Panfil*, 338 F.3d 1299, 1302 (11th Cir. 2003). The commentary in the Guidelines that interprets or explains a Guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that Guideline. *United States v. Rodriguez-Matos*, 188 F.3d 1300, 1310 n.20 (11th Cir. 1999), *quoting Stinson v. United States*, 508 U.S. 36, 38, 123 L. Ed. 2d 598, 113 S. Ct. 1913 (1993). Language in the Sentencing Guidelines is to be given its plain and ordinary meaning. *United States v. Singh*, 291 F.3d 756, 761 (11th Cir. 2002). Where the guidelines provide no indication as to a particular application, we look to the language and purpose of the Sentencing Guidelines for instruction. *Id.*  The Supreme Court has stated that  when there are two rational readings of a criminal statute, one harsher than the other, the rule of lenity dictates that we are to choose the harsher one only when Congress has spoken "in language that is clear and definite." *United States v. Bass*, 404 U.S. 336, 347, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971); *See also, United States v. Jeter*, 329 F.3d 1229, 1230

44

(11th Cir. 2003) (the "rule of lenity" applies if a statute - in this instance, a sentencing guideline - is ambiguous).

The Guidelines refers to three possible sections for these types of convictions, namely 2M5.1, 2M5.2, and 2M5.3.    The Court chose to apply 2M5.2 rather than 2M5.1, even though semi-closed rebreathers are not specifically listed under the United States Munitions List. 22 CFR. Part 121.1.  The rEVO III's  are not on the munitions list, as conceded by the government (Tr.Sent. January 12, 2022, 33-39).

 Section 2M5.2 pertains to "arms, munitions, or military equipment or services." A rebreather is none of those things.  Yet because of how that section is set up, 26 is the default base level, narrowed only by the next section with pertains to small arms (rifles, handguns, or shotguns.) Clearly, that section pertained quite literally to "arms, munitions, or military equipment" of which rifles handguns or shotguns would be a narrower subset, not to any thing  that could be used to train someone to  do something. If that were the case, a toy gun would suffice.  It is not the court's role to expand a criminal statute to favor the government. The rule of lenity applies if a statute is ambiguous. *United States v. Johnson*, 155 F.3d 682, 685 (11th Cir. 1998).

 The commentary further expounds that the list includes "such things as military aircraft, helicopters, artillery, shells, missiles, rockets, bombs, vessels of war, explosives, military and space electronics, and certain firearms." The trial court conceded that rebreathers are not an actual vessel, "It's not a vessel. but it's submersible

and it allows the individual to be sort of an individual submarine without a shell around them." (Tr.Sent. January 11, 2022, p. 18).   Rebreathers do not fall within any of the other categories highlighted by the commentary.   The court's decision to treat rebreathers as a *de facto* vessel for purposes of applying  2M5.2 is a misapplication of the guidelines that ignores the plain language of the Munitions List and Commentary and contradicts the Court's own findings that rebreathers are not in fact vessels. Basically, the court concluded in essence that a person is a vessel, which is contrary to its ordinary meaning [6]  and  a bizarre interpretation of the Guidelines.

Under 2M5.1 a close read of base level 26  shows that it pertains to "national security controls."  As discussed above,  Libya was not controlled for national security

---

[6] According to the American Heritage Dictionary of the English Language, "vessel" is defined as follows:

ves·sel

n.
1. A hollow utensil, such as a cup, vase, or pitcher, used as a container, especially for liquids.
2.
    a. Nautical A craft, especially one larger than a rowboat, designed to navigate on water.
    b. An airship.
3. Anatomy A duct, canal, or other tube that contains or conveys a body fluid: a blood vessel.
4. Botany One of the tubular water-conducting structures of xylem, consisting of a series of vessel elements attached end to end and connected by perforations. Vessels are found in nearly all flowering plants.
5. A person seen as the agent or embodiment, as of a quality: a *vessel of mercy*.

as to the more generalized underwater gear listed under section 8A992. Since the government settled for the fact that the rEVO III's were only useful for training, they were indistinguishable from open-circuit rebreathers not controlled for shipment to Libya at all.

Base Level 26 also pertains to transaction with "countries." In this case, as pointed out above, Sotis had a domestic client, who picked up the items. He did not export, and he did not do trade with a foreign country.

Sotis requests *de novo* review of the trial court's decision to use 2M5.2 to calculate the Defendant's base level offense, which is "warranted in cases where we must determine whether the district court applied the correct sentencing guideline (or subsection of a sentencing guideline) for the defendant's underlying conduct. *See, e.g., United States v. De La Mata*, 266 F.3d 1275, 1302 (11th Cir. 2001). The Eleventh Circuit has previously held, "We have explained that "[a] guideline's meaning is derived first from its plain language and, absent ambiguity, no additional inquiry is necessary." *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004). The plain language of the two sections shows that 2M5.1 is the more applicable section to the allegations alleged against Sotis.

Furthermore, Sotis' sentence is disparate to others similarly situated. Compare with the following:

- *United States v. Banki*, 685 F. 3rd 99 (2nd Cir 2011) IEEPA violation

47

regarding transfer of money to and from Iran. Guideline range was 63-78 months and a 30-month sentence was imposed.

- *United States v. Francois*, 661 Fed.Appx. 587(11th Cir. 2016) Firearms trafficking. The court imposed a 36-month sentence.

- *United States v. Reyes*, 270 F.3d. 1158, (7th Cir. 2001) Smuggling firearms outside the United States. The court imposed a 41-month sentence.

- *United States v. Vasquez*, 2018 WL 3814727 (11th Cir. 2018) Smuggling firearms outside the United States the court imposed a 46-month sentence.

- *United States v. Amirnazmi*, 645 F.3rd 564 (3rd Cir. 2011) Conspiring to International Emergency Econ. Powers Act by selling industrial software to a state-owned Iranian company along with direct dealings with the President of Iran. The court imposed a 48-month sentence.

- *United States v. Piquet*, 372 Fed Appx. 42 (11th Cir. 2010) Violation of export control laws by exporting electronic warfare components to China. The court imposed a 60-month sentence.

Sotis' sentence is out of line. He is entitled to a sentence that is commensurate to others similarly situated.

## A. The Sentencing Error Was Not Harmless

The court's sentencing error was not harmless, even though Sotis was given a below-guideline sentence. The trial court erroneously applied 2M5.2 and found Sotis'

48

base level offense to be 26 instead of constructing his advisory range utilizing the base offense level of 14. Although the Court issued a downward departure from the 26, the Court incorrectly inflated Sotis' base level offense by 12 levels. Even if this court believes that the trial court properly applied a 2-level enhancement for role and for obstruction of justice, the sentence imposed was significantly higher than the advisory range for a total offense level of 18 in criminal category I. A properly calculated level would have yielded an advisory sentence for Sotis of 27-33 months, a sentence far lower than the 57-month sentence he received.

The Eleventh Circuit should conduct a *de novo* review of the trial court's decision to utilize 2M5.2 rather than 2M5.1 and remand Sotis' case for a new sentencing hearing and order that his base offense level begin at 14.

## CONCLUSION

Peter Sotis respectfully requests that his convictions be vacated. In the alternative, Sotis respectfully requests that his sentence be vacated, that he be granted a new sentencing hearing, and for all other just and proper relief.

Respectfully submitted,

*s/ Jane H. Ruemmele*
Jane H. Ruemmele
Attorney for Defendant-Appellant

Dated: May 16, 2022

49

## CERTIFICATE OF COMPLIANCE

This document complies with the type volume limited of Fed R. App. P. 32(a)(7)(B), the word limit of Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed R. App. P. 32(f), this document contains no more than 13,000 words, specifically, 12,621 words.

This document complies with the typeface requirements of Fed R. App. P.32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a) (6). This document has been prepared in a proportionally spaced typeface, Times New Roman, 14 pt, using Microsoft Home and Office 2019.

## CERTIFICATE OF SERVICE

On the May 16, 2022, counsel uploaded this brief *via* e-filing, (ECF) which promptly served opposing counsel:

Laura Thomas Rivero
Direct: 305-961-9433
[COR NTC US Attorney]
U.S. Attorney Service - SFL
99 NE 4TH ST 5TH FL
MIAMI, FL 33132-2111

Lisa Tobin Rubio
Direct: 305-961-9114
[COR NTC US Attorney]
U.S. Attorney Service - SFL
99 NE 4TH ST 5TH FL
MIAMI, FL 33132-2111

U.S. Attorney Service - Southern District of Florida
[COR NTC US Attorney]

U.S. Attorney Service - SFL
99 NE 4TH ST 5TH FL
MIAMI, FL 33132-2111


 On this same date, four paper copies  this brief were mailed to the Clerk of the

court:

Clerk of the Court- Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

                    Respectfully Submitted,


                    *s/ Jane H. Ruemmele*
                    Jane H. Ruemmele, # 6555-49
                    Attorney for Defendant-Appellant