No. 22-10256

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee

v.

PETER SOTIS,
Defendant-Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

BRIEF FOR THE UNITED STATES
AS APPELLEE
_____

MATTHEW G. OLSEN
Assistant Attorney General
for National Security

DANIELLE S. TARIN
Attorney
National Security Division
U.S. Department of Justice
Washington, DC 20530

No. 22-10256
*United States v. Peter Sotis*

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the

United States certifies that, in addition to those persons identified in the brief filed

by defendant-appellant, the following persons may have an interest in the outcome

of this case:

1.  Olsen, Matthew G., U.S. Department of Justice, National Security

Division, Assistant Attorney General for National Security; and

2.  Tarin, Danielle S., U.S. Department of Justice, National Security

Division, Attorney for the United States.

s/ Danielle S. Tarin
DANIELLE S. TARIN
Date: July 15, 2022

i

## STATEMENT REGARDING ORAL ARGUMENT

The United States of America suggests that the issues presented can be determined upon the record and that oral argument would not benefit the panel. The parties' positions are clear, and the record is uncomplicated. *See* Fed. R. App. P. 34(a)(2)(C); 11th Cir. R. 34-3.

## TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement......................i

Statement Regarding Oral Argument ........................................................................ ii

Table of Citations.....................................................................................................v

Statement of Jurisdiction...........................................................................................1

Statement of the Issues..............................................................................................1

Introduction ...............................................................................................................3

Statement of the Case................................................................................................3

I.    Statutory and Regulatory Framework ..............................................................3

II.   Course of Proceedings and Disposition in the Court Below ..........................6

III.  Factual Background ........................................................................................7

    A. Add Helium Receives a Large Order To Ship Diving
       Equipment to Libya ...............................................................................7

    B. Add Helium Is Warned that the Libya Shipment Raises Red Flags.....8

    C. A Federal Agent Instructs Add Helium Not To Ship
       the Rebreathers ...................................................................................12

    D. The Commerce Department Determines an Export License Is
       Required ..............................................................................................15

IV.   Procedural History ........................................................................................17

    A. Charges and Trial ................................................................................17

    B. Sentencing ...........................................................................................18

iii

V.    Standards of Review ....................................................................22

Summary of Argument ........................................................................24

Argument..............................................................................................26

I.    Sufficient Evidence Supported Sotis's Convictions......................26

   A. The Government Proved that the Rebreathers Were the Type of
      Rebreathers that Required an Export License.....................................26

   B. The Evidence at Trial Was Not a Variance from the Allegations in the
      Indictment............................................................................31

   C. The Evidence Was Sufficient for the Jury To Conclude that Sotis
      Committed the Export-Control Offenses Willfully ...........................35

   D. The Evidence Was Sufficient for the Jury To Conclude that Sotis
      Conspired To Violate IEEPA .................................................41

II.    The Witnesses Did Not Invade the Province of Jury ....................42

III.    Sotis's Sentence Was Reasonable ...............................................47

Conclusion ...........................................................................................52

Certificate of Compliance .....................................................................53

Certificate of Service ............................................................................54

iv

## TABLE OF CITATIONS*

**Page**

**Cases**

*Lewis v. United States*, 445 U.S. 55 (1980) ............................................................49

*United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1998) ....................................26

*United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011) ......................................51

*\*United States v. Anderson*, 289 F.3d 1321 (11th Cir. 2002) ....................22, 35, 41

*United States v. Banki*, 685 F.3d 99 (2d Cir. 2011) ................................................51

*United States v. Barton*, 909 F.3d 1323 (11th Cir. 2018) ..................................44, 46

*United States v. Bennett*, 472 F.3d 825 (11th Cir. 2006) ...................................23, 47

*United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) .................................23, 43

*United States v. Brannan*, 562 F.3d 1300 (11th Cir. 2009) ...............................22, 29

*United States v. Calderon*, 127 F.3d 1314 (11th Cir. 1997) ....................................32

*United States v. Cheng*, 2016 WL 413077 (D. Mass. Feb. 1, 2016) ......................51

*United States v. Clarke*, 649 F. App'x 837 (11th Cir. 2016) .............................23, 42

*United States v. Davila*, 749 F.3d 982 (11th Cir. 2014) ..........................................22

*United States v. Flynt*, 15 F.3d 1002 (11th Cir. 1994) ............................................34

*United States v. Francois*, 661 F. App'x 587 (11th Cir. 2016) ...............................51

*United States v. Fuentes-Coba*, 738 F.2d 1191 (11th Cir. 1984) .....................44, 45

---

* Authorities upon which we chiefly rely are marked with asterisks.

v

*United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011) ...........................................51

*United States v. Hawkins*, 905 F.2d 1489 (11th Cir. 1990) ....................................46

*United States v. Jones*, 913 F.2d 1552 (11th Cir.1990)...........................................34

*United States v. Lee*, 427 F.3d 881 (11th Cir. 2005) ........................................23, 42

*United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) ..........................................41

*United States v. McKeeve*, 131 F.3d 1 (1st Cir. 1997)............................................51

*United States v. Piquet*, 372 F. App'x 42 (11th Cir. 2010) ....................................51

*United States v. Quinn*, 403 F. Supp. 2d 57 (D.D.C. 2005)....................................27

*United States v. Reyes*, 270 F.3d 1158 (7th Cir. 2001)...........................................51

*United States v. Richard*, 969 F.2d 849 (10th Cir. 1992) .......................................45

*United States v. Sandoval-Ortiz*, 182 F. App'x 380 (5th Cir. 2006) ......................46

*United States v. Shetterly*, 971 F.2d 67 (7th Cir. 1992)..........................................51

*\*United States v. Singer*, 963 F.3d 1144 (11th Cir. 2020)............................4, 27, 50

*United States v. Vasquez*, 2018 WL 3814727 (11th Cir. 2018).............................51

*United States v. Williamson*, 53 F.3d 1500 (10th Cir. 1995)..................................33

*United States v. Wilson*, 788 F.3d 1298 (11th Cir. 2015)..................................31, 35

*United States v. Zhen Zhou Wu*, 711 F.3d. 1 (1st Cir. 2013)....................................4

*United States v. Zinn*, 321 F.3d 1084 (11th Cir. 2003)...........................................23

*United States v. Zitron*, 810 F.3d 1253 (11th Cir. 2016)...................................22, 26

vi

**Statutes**

18 U.S.C. § 2 ................................................................6, 17, 18

18 U.S.C. § 371 ...........................................................6, 17, 26

18 U.S.C. § 554 ...............................................6, 18, 19, 27, 47

18 U.S.C. § 1001 ...............................................................6, 18

18 U.S.C. § 3231 ...................................................................1

18 U.S.C. § 3553 ..............................................................20, 21

18 U.S.C. § 3742 ...................................................................1

22 U.S.C. § 2778 ..................................................................49

28 U.S.C. § 1291 ...................................................................1

50 U.S.C. § 1705 ...............................................3-6, 17, 19, 27, 47, 49

15 C.F.R. § 730.3 ..............................................................4, 50

15 C.F.R. § 764.2 ..............................................................6, 17

15 C.F.R. § 774 ................................................................5, 27

**Other Authorities**

2021 U.S. Sentencing Guidelines Manual

U.S.S.G. § 2B.1.1 ...............................................19, 47

U.S.S.G. § 2M5.1...............................................47, 50

U.S.S.G. § 2M5.2........................... 19, 20, 25, 47, 49-51

U.S.S.G. § 2X7.2 ....................................................50

U.S.S.G. § 3B1.1 ............................................................................................19

U.S.S.G. § 3C1.1 ...........................................................................................19

U.S.S.G. App. A ............................................................................................47

STATEMENT OF JURISDICTION

This is an appeal from a final judgment of the district court in a criminal case.  D.E.156.[1]  The district court entered judgment against Peter Sotis on January 13, 2022.  *Id.*  The district court had jurisdiction to enter this judgment under 18 U.S.C. § 3231.  Sotis filed a timely notice of appeal on January 20, 2022.  D.E.160.  This Court has jurisdiction over Sotis's appeal under 28 U.S.C. § 1291 and has authority to examine his challenge to his sentence under 18 U.S.C. § 3742.

STATEMENT OF THE ISSUES

1.  Whether, under plain-error review, the evidence was sufficient for the jury to conclude that an export license was required.

2.  Whether, under plain-error review, there was a fatal variance between the evidence at trial and the allegations in the indictment.

3.  Whether, viewing the evidence in light most favorable to the government, the evidence was sufficient for the jury to conclude that Peter Sotis committed the export-control offenses willfully.

4.  Whether, viewing the evidence in light most favorable to the government, the evidence was sufficient for the jury to conclude that Sotis and Voissem

---

[1] D.E.__ refers to the district court docket entry in *United States v. Sotis*, No. 19-cr-20693 (S.D. Fla.).

1

conspired to violate the International Emergency Economic Powers Act and the Export Administration Regulations.

5.  Whether the witnesses' testimony invaded the province of the jury.

6.  Whether, under plain-error review, the district court's sentence was procedurally unreasonable.

INTRODUCTION

A "rebreather" is an underwater breathing system that recycles the diver's exhaled breath, but unlike traditional open-circuit diving systems, rebreather systems produce few or no bubbles. For this reason, rebreathers are commonly used by military divers for covert underwater missions, and this military usage generally subjects rebreathers to export-control laws.

Defendant-appellant Peter Sotis and his codefendant Emilie Voissem caused the shipment of rebreathers to Libya after receiving instructions from a federal agent not to ship them until the U.S. Department of Commerce determined whether an export license was required. Despite knowing the national security concerns that exporting rebreathers raises, and despite being told to wait, Sotis and Voissem arranged for an intermediary to export the rebreathers to Libya without a license. A jury convicted them of several export-control felonies, and this appeal follows.

STATEMENT OF THE CASE

I.    Statutory and Regulatory Framework

Section 1705(a) of the International Emergency Economic Powers Act (IEEPA) makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of" the Export Administration Regulations (EAR). *See*

50 U.S.C. § 1705(a). Any "person who willfully commits [or] willfully attempts to commit" a violation under Section 1705(a) is guilty of a federal felony. *Id.* at § 1705(c); *see United States v. Zhen Zhou Wu*, 711 F.3d. 1, 21 (1st Cir. 2013) ("The IEEPA's penalty provision applies to violations of the [EAR].").

The EAR, which are administered by the Department of Commerce, control the export of "dual use" items that have military and civilian applications. 15 C.F.R. § 730.3. The EAR control these items because they "could make a significant contribution to the military potential of other nations" or "could be detrimental to the foreign policy or national security of the United States." *See United States v. Singer*, 963 F.3d 1144, 1150 (11th Cir. 2020). The EAR generally prohibit exporting dual use items to a foreign country without a license from the Department of Commerce's Bureau of Industry and Security. *See id.*

The Department of Commerce has put "the most sensitive items subject to EAR controls on the Commerce Control List." *Id.* Items are categorized by "Export Control Classification Number (ECCN), each of which is subject to export-control requirements, depending on the destination, end use, and end user of the item." *Id.*; D.E.175:43. As relevant here, ECCN 8A002 covers "[m]arine systems, equipment, 'parts,' and 'components.'" *See* D.E.175:199. Items that fall

4

within ECCN 8A002 require a license for exportation to Libya for national security reasons.[2]  *See* D.E.175:200.

Closed circuit and semi-closed circuit rebreathers fall within ECCN 8A002 and thus may not be exported to Libya without a license.[3]  D.E.175:197-200. These items are subject to export controls because they conceal the diver's activities from people on the surface and allow a diver to stay underwater longer compared with normal diving equipment by producing few or no bubbles and re-circulating a diver's own breath after replacing its carbon dioxide with oxygen. *See id.*  Exporting these rebreathers to Libya without a valid license violates IEEPA and, if willfully committed, is a felony.  *See* 18 U.S.C. §§ 1705(a), (c).

---

[2] To determine whether a particular item requires an export license, a potential exporter must locate the ECCN for the item on the Commerce Control List.  The ECCN provides the license requirements by listing the export license codes.  The ECCN for closed and semi-closed circuit rebreathers is 8A002.  *See* 15 C.F.R. § 774.  ECCN 8A002 provides that codes NS (for national security) and AT (for anti-terrorism) apply for the entire entry and that, for the Commerce Country Chart, NS column 2 and AT column 1 apply.  The corresponding columns on the Commerce Country Chart display an "X" in the box where NS column 2 meets the row for Libya; they display no "X" in AT column 1.  This means that an export license is required and that the reason for the requirement is national security.  *See* D.E.175:194-200.

[3] Individual rebreathers accompanying the end user, however, are not subject to export controls.  D.E.175:198-200.

II.    <u>Course of Proceedings and Disposition in the Court Below</u>

A grand jury returned an indictment against Peter Sotis and Emilie Voissem for their efforts to export four rebreathers to Libya without a license. Sotis and Voissem were charged with conspiracy to violate IEEPA and the EAR, in violation of 18 U.S.C. § 371 (Count 1); attempted export of a Commerce Control List item to Libya without a license, in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 2 and 15 C.F.R. § 764.2 (Count 2); and smuggling, in violation of 18 U.S.C. §§ 554(a), 2 (Count 3). Voissem was also charged with making a materially false statement to a federal agent, in violation of 18 U.S.C. § 1001, for statements she made to a Department of Commerce agent who was investigating the export-control violations (Count 4).

After trial, the jury found Sotis and Voissem guilty of all three export-control counts and found Voissem not guilty of the false-statement count.[4] D.E.102; D.E.103. The district court sentenced Sotis to 57 months in prison followed by three years of supervised release. D.E.156. The district court sentenced Voissem to five months in prison followed by three years of supervised release. D.E.155. Sotis timely filed a notice of appeal. D.E.160.

---

[4] Sotis is incorrect that "[t]he jury returned a verdict of guilty for Sotis and Voissem on all counts on October 21, 2021." *Compare* Br. 10, *with* D.E.155. Voissem was acquitted of the false-statement count. D.E.155; D.E.199:14, 19.

III.    Factual Background

    A. Add Helium Receives a Large Order To Ship Diving Equipment to Libya

Peter Sotis was the majority owner, and Emilie Voissem was the manager, of Add Helium LLC, a Fort Lauderdale, Florida company that sold and exported diving equipment, and trained divers to use it.  D.E.175:45; D.E.177:12-15.  In April 2016, Osama Bensadik, a Virginia resident, contacted Add Helium to buy over $100,000 of rEvo III Micro FT Expedition rebreathers[5] and other diving equipment that Sotis and Voissem were to ship to a third-party entity, CODI Group, in Libya.  D.E.177:19-25; D.E.176:22-29.  Bensadik asked Add Helium to coordinate the order through Mohammad and Diana Zaghab, who owned Ramas LLC, an export company in Virginia.  D.E.176:19-26.

This was "a very large order" for Add Helium.  D.E.177:25, 64.  Sotis made it clear to his team that the order was important because it was a lucrative sale that could lead to more business in the future.  D.E.110-28; D.E.177:25, 128-30 (Robotka testifying that Sotis described the order as a "whale").  Generating business was critical to Sotis, as Sotis was having "some financial issues" at that time.  D.E.177:50.  Add Helium owed debts of at least $30,000, and Sotis needed help paying those debts.  D.E.177:50-53.

---

[5] "rEvo" refers to the manufacturer's name.  *See* D.E.177:28; D.E.175:96.

B. <u>Add Helium Is Warned that the Libya Shipment Raises Red Flags</u>

That spring, Voissem contacted Global Forwarding, a shipping company that Add Helium often hired to ship its products, about shipping the order to Libya. *See* D.E.110-36; D.E.175:181-83. In July 2016, a Global Forwarding representative told Voissem that "[t]his shipment to Libya might be more complicated than originally thought." *Id.* He said Voissem needed to call the Commerce Department and the U.S. Department of State "to get approval" for the shipment, D.E.175:183-86, and to determine whether an export license was required because "Libya is on [a] restricted list," D.E. 110-36. *See* D.E.159:8.

On July 28, 2016, Voissem told Sotis that their contact at Global Forwarding raised "red flags" with the Libya shipment, that "there was a change in the state of the [Libyan] government and concern for terrorism," that "there was a potential hold with the Department of Commerce," and that "it is [Add Helium's] responsibility to clear the items with the Department of Commerce." D.E.110-38; *see* D.E.175:103-04; D.E.177:35-36; D.E.178:59-60; *see also* D.E.110-37; D.E.177:33-34. Sotis told Voissem, "Go ahead and look into the department of commerce requirements and see how time consuming it might be. [T]hen we can make a determination." D.E.110-45; *see* D.E.175:105-06; D.E.177:143.

8

In July 2016, Shawn Robotka, a minority owner of Add Helium's parent company, learned that the shipment of rebreathers was supposed to go to Libya. D.E.177:30.  Voissem approached Robotka, telling him she was concerned that Add Helium would not be able to ship the items to Libya and that Sotis "was going to be very upset with her."  D.E.177:29-30.  Robotka told Voissem that he did not think Add Helium could ship the items to Libya legally because, among other reasons, the rebreathers had military applications.  D.E.177:30-33, 46; *see* D.E.111-8; D.E.177:37-41; *see also* D.E.178:66, 69 (texting Voissem on July 29 that the rebreathers "have a distinctive military application").  Robotka also told Sotis that he did not think Add Helium could ship the items to Libya.  D.E.177:32-33, 214.  Robotka expressed to both Sotis and Voissem his "real concerns" about the shipment.  *See* D.E.177:46.

On July 29, 2016, Voissem notified Mohammad and Diana Zaghab of Ramas LLC that there might be a problem sending the items to Libya.  D.E.176:45. Voissem told them that Global Forwarding "put an alert on [the shipment] due to the items, and that it was going to Libya."  D.E.110-41.  She said that she "would have to contact the Department of Commerce, which [she had] been working on to get a more definitive answer regarding the shipment and if the items could in fact

9

be shipped." *Id.*  Voissem said that she would give the Zaghabs more information once she got answers from the Commerce Department.  *Id.*; D.E.176:45, 120-21.

Later that day, Diana Zaghab responded to Voissem.  Diana, who had experience shipping items like household products (but not diving equipment) to Libya, told Voissem that the Commerce Department would require a special license if the item were "considered sensitive, high technology."  D.E.110-42; *see* D.E.176:46.  She asked Voissem if the equipment Add Helium was shipping to Libya was "special high tech or can be deemed as dual use"—having a military, as well as a civilian, application.  D.E.110-42.  Voissem responded, "The products being shipped are considered by us to be recreational/technical diving equipment." D.E.110-43; D.E.176:126, 158, 166-67.

Voissem then emailed Sotis and Robotka, telling them that she had updated Mohammad Zaghab "with the latest."  D.E.110-44.  She also said that she had spoken with a federal agent at the Commerce Department, who directed her to the Bureau of Industry and Security and informed her that "shipping to Libya was probably not going to happen because of how volatile it still is."  *Id.*; D.E.175:106. Voissem also told Sotis that Robotka had given her a copy of an executive order from the President "basically banning export of goods and stopping travel from the

US" to Libya.  D.E.175:107; D.E.110-44 (attaching Executive Order 13726).[6]

Robotka had provided the executive order to Sotis previously.  D.E.177:32-33.

On July 30, Sotis told Voissem that "if the president has banned all shipments to Libya," Bensadik and the Zaghabs "are going to have to find another route or handle it from here.  We do not need trouble from the government for making an illegal shipment."  D.E.110-45.  Sotis also told Voissem that Bensadik and Mohammad Zaghab should "manage this problem" and tell Add Helium "how they intend to receive their goods as we can't ship to Libya."  *Id.*; *see* D.E.177:36; D.E.175:107-08.

On August 1, after Add Helium had repeatedly delayed the shipment, Mohammad Zaghab suggested that Add Helium use "his shipping companies" instead of Global Forwarding.  D.E.159:9.  The next day, Voissem agreed.  *Id.*; D.E.176:46-47, 145-46; D.E.110-53.  Diana Zaghab began gathering information from Voissem to prepare the shipment.  She asked Voissem why the shipment had been flagged by Global Forwarding and whether any of the items in the shipment needed an export license or were considered dual use.  D.E.110-48; D.E.176:130-31.  Voissem did not respond to that question or otherwise indicate to the Zaghabs

---

[6] Contrary to Robotka's understanding, the executive order did not apply to the Libya shipment.  D.E.176:195.

that the rebreathers had a military application. D.E.176:49-50, 105. Instead, Voissem coordinated with the Zaghabs about how the Zaghabs would pick up and ship the rebreathers to Libya themselves. D.E.159:9.

### C. A Federal Agent Instructs Add Helium Not To Ship the Rebreathers

Special Agent Brent Wagner from the Commerce Department met with Robotka, Voissem, and Deb Wesler (who was Voissem's assistant) at Add Helium on August 4, 2016, to discuss the Libya shipment. D.E.175:43-48; D.E.177:33. Another agent had told Special Agent Wagner that a company in Fort Lauderdale was trying to export rebreathers, so Special Agent Wagner agreed to speak with the company about exporting equipment abroad. D.E.175:43-44. Sotis knew that Special Agent Wagner was coming to Add Helium to discuss the Libya shipment but was "very adamant" about not attending the meeting. D.E.177:42-43.

At the meeting, Special Agent Wagner explained to Robotka, Voissem, and Wesler the "red flags . . . to look for as far as suspicious activities" and "transactions" and the importance of conducting their own "due diligence" about their shipments. D.E.175:48. He also gave them information about export rules and regulations. D.E.159:9. As relevant here, he explained that if the regulations prohibit an item from being shipped to a particular country, the shipper cannot try to circumvent those regulations by (1) shipping the item to another country or a

12

series of other countries first (a practice known as "transhipping") or (2) "having

somebody else do the shipping" for the seller (a practice known as "transferring").

D.E.175:49-50; *see* D.E.177:47-48.

Special Agent Wagner then turned to the rebreathers that Add Helium

wanted to ship to Libya.  He said that Add Helium needed to seek a "license

determination" from the Commerce Department before shipping the rebreathers

but that he did not think that Add Helium would be able to get a license because of

the rebreathers' military application.  D.E.175:50-52, 57-61.  Special Agent

Wagner said that he would apply for an expedited license determination on Add

Helium's behalf.  D.E.175:59-61, 68.  He also made clear that until Add Helium

obtained a license determination, the rebreathers were "detained" at Add Helium

and could not be sent to Libya.  D.E.175:62; D.E.159:9; *see* D.E.177:46-47.

Later that day, Robotka briefed Sotis on the meeting.  D.E.177:48.  Robotka

explained to Sotis that Add Helium "could not release the shipment"; that

transshipping the items "was also illegal"; and that they would have to wait for a

license determination before the items could leave Add Helium's warehouse,

where they were currently stored.  *Id.*; D.E.177:215-216; D.E.159:9.  Sotis then

"instructed his employees to cease communicating with him over email regarding

the rebreather shipment to Libya."  D.E.159:9.

Meanwhile, the Zaghabs were trying to gather information from Voissem to ensure the shipment complied with applicable rules and regulations. D.E.110-57; *see* D.E.176:132-34. Diana Zaghab "kept on looking for confirmation" from Voissem that the shipment did not have any materials that would require a license and that the shipment was compliant with export regulations. D.E.176:148. Sotis instructed Voissem not to tell the Zaghabs about the meeting with Special Agent Wagner. Voissem obeyed that instruction and did not tell the Zaghabs about the meeting, nor did she tell them that the items were detained, that a license determination was pending, or that the rebreathers had a military application. *Id.*; D.E.176:50, 58-59, 61-62, 133-34, 139-40 196; D.E.178:74; D.E.159:9.

In a call with Mohammad Zaghab, Sotis told Mohammad that an agent from the Commerce Department came to Add Helium's warehouse and "looked at the merchandise." D.E.176:51. Mohammad asked what the agent said, and Sotis replied that the agent "didn't say anything" but just "looked at the products" and then left. *Id.*; D.E.159:9. Sotis also said that none of his employees talked with the agent. D.E.176:51-52. Based on Sotis's statements, Mohammad understood that the agent had merely conducted a "random check" of the warehouse. *Id.* Mohammad subsequently asked Voissem about the agent's visit, and Voissem said "[n]obody told [Add Helium] anything or sent them anything." D.E.176:53.

14

On August 9, Voissem provided the rebreathers to a local transportation company hired by the Zaghabs' company, Ramas LLC.  D.E.159:9.  The transportation company picked up the rebreathers from Add Helium and transported them to Miami, Florida, where they were flown out of the United States en route to Libya.  D.E.176:50, 56.  Voissem coordinated the pickup with the Zaghabs and handled the bill of lading, which noted that the ultimate destination for the rebreathers was Libya.  D.E.176:134-39; D.E.110-19.  Voissem and Sotis knew that the rebreathers were leaving the United States en route to Libya.  D.E.178:62-64.

    D. <u>The Commerce Department Determines an Export License Is Required</u>

On August 17, Special Agent Wagner told Sotis, Robotka, and Voissem that a preliminary license determination had been made and that they needed a license to ship the rebreathers to Libya.  D.E.175:71.  Special Agent Wagner also told them that "the shipment was not to go anywhere, and that the shipment was going to be seized."  D.E.177:56; *see* D.E.178:79.  Neither Sotis nor Voissem told Special Agent Wagner or Robotka that the rebreathers had already been shipped to Libya or had left Add Helium's warehouse.  D.E.159:10; D.E.175:72; D.E.177:55-56.  Neither Sotis nor Voissem told the Zaghabs about the license determination.  D.E.178:79

15

On August 24, Special Agent Wagner met with Voissem and Robotka at Add Helium for a second time. Special Agent Wagner explained that, after the preliminary determination, he received confirmation that the rebreathers could not be shipped without an export license. D.E.177:59-64. He said that the shipment "was still going to be detained at Add Helium until [the Commerce Department] determined, one, if [Add Helium] could get a license, and two, if [the Commerce Department] could get information on the ultimate end users of the rebreathers" and other equipment in the shipment. D.E.175:76; *see* D.E.177:62.

Before Special Agent Wagner left, Sotis approached him and introduced himself as Add Helium's owner. D.E.159:10. Special Agent Wagner summarized for Sotis his discussion with Voissem and Robotka. *Id.* Sotis "admitted that he knew this kind of technology could be used against [the United States]" and that "he did not want that to happen." *Id.* Then Sotis asked Special Agent Wagner and Voissem to go into his office to discuss the Libya shipment, where Sotis told Special Agent Wagner that the shipment was already en route to Libya. D.E.175:79-80. Special Agent Wagner told Sotis to get the shipment back. D.E.175:80-81. Sotis said there was nothing that he could do. *Id.*

Special Agent Wagner was able to divert the shipment back to Miami, where it was seized by the government. D.E.175:82-89; D.E.176:139. The Zaghabs

16

eventually learned that the shipment had been diverted back to the United States because of the rebreathers.  D.E.176:139.  No one at Add Helium ever told them that the rebreathers could not be shipped to Libya or that the shipment required a license.  D.E.176:61-62.  The Zaghabs were not charged with any wrongdoing, D.E.159:12, and government investigators confirmed that the Zaghabs "had no idea what was going on."  D.E.176:196.  Nonetheless, because of the Libya shipment, the Zaghabs were labeled "terrorists," lost business, and eventually had to shut down Ramas LLC.  D.E.176:62-63, 141.  Robotka also "lost a substantial amount of money and his reputation was 'destroyed.'"  D.E.159:12.

After the federal investigation began, Sotis threatened to kill Robotka to dissuade Robotka from cooperating with the investigation. D.E.159:11-12; D.E.177:68-74.  Sotis was also aware that one of his employees destroyed documents related to the investigation.  D.E.177:73-74.

IV.    Procedural History

A. Charges and Trial

On October 24, 2019, Sotis and Voissem were indicted with conspiracy to violate IEEPA and the EAR, in violation of 18 U.S.C. § 371 (Count 1); attempted export of a Commerce Control List item to Libya without a license, in violation of 50 U.S.C. § 1705, 18 U.S.C. § 2, and 15 C.F.R. § 764.2 (Count 2); and smuggling,

in violation of 18 U.S.C. §§ 554(a), 2 (Count 3). Voissem was also charged with making a materially false statement to a federal agent, in violation of 18 U.S.C. § 1001 (Count 4). D.E.3. After a joint trial, the jury found Sotis and Voissem guilty of all three export-control counts and found Voissem not guilty of the false-statement count. D.E.102-03.

At the close of the government's case and again at the close of trial testimony, Sotis moved for a directed verdict of acquittal on all three counts against him, arguing that the government's witnesses lacked credibility. D.E.177:232; D.E.199:22. The district court denied the motion. D.E.177:250; D.E.199:22. The district court found that Sotis's motion raised "credibility issues that only the jury can decide." D.E.177:250; *see* D.E.199:22 (finding that the case "was strictly a credibility case—a credibility with documentation case"). The district court explained that "the jury did not have any difficulty reaching its verdict on the first three counts as to both defendants" and that "[t]he jury had a right to disbelieve any witness in whole or in part and . . . that's their job and they made that decision." D.E.199:22.

B. <u>Sentencing</u>

The Draft Presentence Investigation Report ("PSR") calculated an advisory sentencing range under the 2021 U.S. Sentencing Guidelines Manual ("U.S.S.G.")

18

of 121 to 151 months of imprisonment. D.E.126:23. The PSR first calculated a base offense level of 26, based on U.S.S.G. § 2M5.2(a)(1), the Guideline for violations of 50 U.S.C. § 1705 and 18 U.S.C. § 554(a). D.E.126:14; *see* D.E.159:14. That Guideline applies to offenses involving the exportation of "arms, munitions, or military equipment or services without required validated export license." U.S.S.G. § 2M5. The PSR also recommended applying a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and a four-level enhancement for Sotis's leadership role under U.S.S.G. § 3B1.1(c). D.E.126:14; *cf.* D.E.159:13. The PSR then calculated a criminal history category of I. D.E.127:16; *see* D.E.159:15-16. With a total offense level of 32 and a criminal history category of I, the PSR calculated an advisory sentencing range of 121 to 151 months of imprisonment. D.E.127:23; *cf.* D.E.159:23. The government asked the district court to sentence Sotis to a term of imprisonment within this range. D.E.149:1.

Sotis argued that his base offense level should have been 6, not 26, under U.S.S.G. § 2B1.1(a)(1), which is the Guideline that applies to economic offenses, including theft, embezzlement, receiving stolen property, and property destruction. D.E.137:6-8; D.E.135:9. Sotis argued that U.S.S.G. § 2M5 did not apply because the rebreathers he attempted to export to Libya were not "arms, munitions or

19

military equipment as those terms are typically defined and understood."
D.E.137:3-6; *see* D.E.135:8. He also argued that neither the obstruction-of-justice
nor the leadership enhancement should apply. With a total offense level of 6 and a
criminal history category of I, Sotis claimed that his advisory sentencing range was
only zero to six months of imprisonment. *See* D.E.137:8-12. After also addressing
the sentencing factors under 18 U.S.C. § 3553(a), Sotis asked the district court to
impose "a non-guideline sentence." D.E.137:24.

The district court held a sentencing hearing over two days, on January 11
and 12, 2022. D.E.152-54. The district court agreed with the PSR that U.S.S.G.
§ 2M5.2(a)(1) applied, setting the base offense level at 26. Then the district court
departed downward five levels to level 21 under Application Note 2, which permits
the court to depart from the Guidelines based on the "degree to which the violation
threatened a security or foreign policy interest of the United States, the volume of
commerce involved, the extent of planning or sophistication, and whether there
were multiple occurrences." U.S.S.G. § 2M5.2, cmt. n.2.

The district court explained that although the rebreathers could be used for
military purposes, "there was no evidence at trial as to the degree to which . . . this
violation threatened a specific security or foreign policy interest of the United
States, with the exception of the fact that . . . we have an interest in upholding the

20

law." D.E.186:42.  Addressing the volume of commerce involved, the district

court found that "Add Helium did not actively recruit a marketing scheme to sell

[the rebreathers to] Libya" and that the sale represented "a hope of future

business." D.E.186:42-43.  The district court also found that the planning was, "at

best, an ad hoc planning" and that the sale was "a one time" sale.  D.E.186:43.

Then the district court applied a two-level enhancement for obstruction of

justice and a two-level enhancement for Sotis's leadership role.  *Id.*  Those

enhancements brought the total base offense level to 25.  *Id.*  With a total base

offense level of 25 and a criminal history category of I, the district court

determined that the advisory Guidelines range was 57 to 71 months of

imprisonment.  D.E.186:44.  Sotis objected to the district court's decision not to

depart downward further.  D.E.186:47-59.

Addressing the sentencing factors listed in 18 U.S.C. § 3553(a), the district

court recognized that Sotis "ha[d] attempted to maintain a law-abiding life," had

many "gifts" and "a passion for an area that [he has] developed," and had

contributed his passion to the community by mentoring others.  D.E.186:91.  The

district court also found that Sotis lacked self-discipline and a willingness to defer

to and to respect the law and that Sotis did not convey "a true contriteness of

heart." D.E.186:92-93.  The district court explained that it could not ignore the

21

choice Sotis had made, the directions he gave to Voissem, and the consequences of

his actions, including the impact his actions had on the Zaghabs.  D.E.196:93.

The district court imposed a sentence of 57 months of imprisonment, the low

end of the advisory Guidelines range, to be followed by 3 years of supervised

release.  D.E.186:93-94.  The district court found that this sentence would "provide

just punishment and adequate deterrence to the criminal conduct" and was within

the range of sentences for similarly situated defendants.  *Id.*

V.    Standards of Review

When properly preserved, this Court "review[s] de novo a defendant's claim

that the evidence was insufficient to convict him, viewing the evidence and all

reasonable inferences and credibility choices in the light most favorable to the

government."  *United States v. Anderson*, 289 F.3d 1321, 1325 (11th Cir. 2002).

Insufficient-evidence claims raised for the first time on appeal are reviewed for

plain error.  *United States v. Zitron*, 810 F.3d 1253, 1260 (11th Cir. 2016).  When

the defendant invites the error, this Court is barred from reviewing the claimed

error on appeal.  *United States v. Brannan*, 562 F.3d 1300, 1307 (11th Cir. 2009).

To obtain reversal under plain-error review, the defendant must show that

there is "(1) error, (2) that is plain, and (3) that affects substantial rights."  *United*

*States v. Davila*, 749 F.3d 982, 993 (11th Cir. 2014) (quotation marks and citation

22

omitted).  If all these conditions are met, this Court may "exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and citation omitted).

This Court generally reviews a claim that a witness invaded the province of the jury for an abuse of discretion.  *United States v. Lee*, 427 F.3d 881, 896 (11th Cir. 2005).  If that claim is unpreserved, this Court reviews the claim for plain error.  *United States v. Clarke*, 649 F. App'x 837 (11th Cir. 2016).  Any error is subject to harmless-error review, which means that reversal is not required unless there is a reasonable possibility that the improperly admitted evidence had a substantial influence on the outcome of the proceedings.  *United States v. Bradley*, 644 F.3d 1213, 1270 (11th Cir. 2011).

This Court reviews for plain error an unpreserved claim that the district court's sentence was procedurally unreasonable.  *See United States v. Bennett*, 472 F.3d 825, 831-32 (11th Cir. 2006); *see also United States v. Zinn*, 321 F.3d 1084, 1088 (11th Cir. 2003) ("[I]f a defendant fails to clearly articulate a specific objection during sentencing, the objection is waived on appeal and we confine our review to plain error.").

<u>SUMMARY OF ARGUMENT</u>

This Court should affirm Sotis's convictions and sentence.

First, Sotis repeatedly told the jury and the district court that he did not dispute that a license was required to export the rEvo rebreathers to Libya, so Sotis should not be permitted to argue the opposite on appeal. Regardless, the government presented ample evidence to support the jury's verdict because two federal agents testified that the rEvo rebreathers were the type of rebreathers that required a license for export to Libya.

Second, the evidence presented at trial was not a variance from the allegations in the indictment. The evidence at trial was sufficient for the jury to find that the rEvo rebreathers were closed circuit rebreathers and had a military application, as alleged in the indictment. Any variance was immaterial because both "closed circuit" and "semi-closed circuit" rebreathers were on the Commerce Control List and thus required a license for export to Libya.

Third, the government presented ample testimony to support the jury's verdict that Sotis committed the export-control offenses willingly. Sotis and his agents were expressly informed by a government agent that it would be illegal to ship the rebreathers to Libya, and they did it anyway.

24

Fourth, the government presented ample testimony to support the jury's verdict that Sotis and Voissem conspired to violate the IEEPA. Although Add Helium did not ship the rebreathers, the evidence showed that Sotis and Voissem arranged for an intermediary to export the rebreathers to Libya without a license. A federal agent testified that a license would still be required in this circumstance but that neither Sotis nor Voissem had obtained one.

Fifth, the witnesses did not invade the province of the jury because their testimony did not amount to an opinion on the ultimate question of Sotis's guilt. In any event, any error was harmless because the evidence of his guilt was overwhelming.

Sixth, the district court's sentence was procedurally reasonable. The district court correctly calculated the advisory Guidelines range by applying U.S.S.G. § 2M5.2 to set the base offense level. That Guideline applies to offenses involving the exportation of "military equipment," and the rEvo rebreathers fall within the plain meaning of that term.

ARGUMENT

I.    Sufficient Evidence Supported Sotis's Convictions

A. The Government Proved that the Rebreathers Were the Type of
   Rebreathers that Required an Export License

Sotis argues that this Court should reverse his conviction because the
government failed to prove that the rebreathers he sent to Libya were the kind of
"closed circuit" rebreathers that required an export license. Br. 14-28. Because
Sotis did not argue below that the evidence was insufficient on this basis, this
Court's review is limited to plain error. *Zitron*, 810 F.3d at 1260. There is no
error. Sotis's claim is inconsistent with his position below, where he not only
failed to preserve this argument but also repeatedly told the district court that he
did not dispute that a license was required. In any event, the government presented
ample evidence to support the jury's verdict.

To prove that Sotis conspired to violate the International Emergency
Economic Powers Act (IEEPA), the government was required to show that there
was an agreement to make an illegal export, that Sotis knew of the unlawful plan
and willingly joined in it, and that he committed at least one overt act to carry out
the agreement. 18 U.S.C. § 371; *see United States v. Adkinson*, 158 F.3d 1147,
1153 (11th Cir. 1998); *see also* D.E.178:124-25. To prove that Sotis attempted to
violate and violated IEEPA, the government had to show that (1) Sotis exported,

26

caused the export, transferred for export, or aided and abetted the attempted export of an item from the United States; (2) that this item was controlled for export on the Commerce Control List; (3) that Sotis failed to obtain a license (or other authorization) from the Commerce Department before the attempted exportation; and (4) that Sotis did so willfully.  50 U.S.C. § 1705(a), (c); *see United States v. Quinn*, 403 F. Supp. 2d 57, 66 (D.D.C. 2005); *see also* D.E.178:126-28.  Finally, to prove that Sotis engaged in smuggling, the government was required to prove that Sotis fraudulently and knowingly exported or sent from the United States, attempted to export or to send from the United States, or aided or abetted any such export of any merchandise, article, or object contrary to U.S. law.  18 U.S.C. § 554(a); *see Singer*, 963 F.3d at 1166; *see also* D.E.178:128-30.

The offenses of conviction thus required proof that the rebreathers Sotis attempted to export to Libya required an export license.  Contrary to Sotis's argument, the government did not need to prove specifically that the rebreathers were "closed circuit" or that they had any specific military capability.  Rather, the question is whether, in the context of the evidence presented in this particular case, there was sufficient evidence for the jury to conclude that Sotis needed a license to export the rEvo rebreathers that he tried to send to Libya.  *See* 15 C.F.R. § 774 (regulation requiring an export license for "closed circuit" and "semi-closed

27

circuit" rebreathers). Under the relevant regulations, the rEvo rebreathers were subject to the license requirement if they were either "closed circuit" or "semi-closed circuit" rebreathers. *See id.* As explained below, there was ample evidence supporting the jury's conclusion that the rebreathers were in fact closed circuit or semi-closed circuit rebreathers as set forth in the regulation.

The only issue at trial was the defendants' criminal intent. *See*, *e.g.*, D.E.175:29, 38. Critically, counsel for both Sotis and Voissem told the jury that there was no dispute that (1) the rEvo rebreathers they tried to send to Libya were controlled for export on the Commerce Control List; (2) the rebreathers required an export license; and (3) Add Helium did not have an export license for the rebreathers. *See*, *e.g.*, D.E.175:29 (Sotis's counsel arguing to the jury that "we are not disputing that the license is required" and that "[w]e are not disputing that they didn't have a license"); D.E.174:16 ("The principal argument that we made with respect to the rEvo rebreathers, clearly rebreathers are on the Commerce Control List that's issued by the Commerce Department, which means they require a license. That's not an issue in the case."); *see* D.E.175:19-20 ("And because [the rebreather] has that dual application, it is listed on this Commerce Control List as the type of equipment that requires a license if sent to certain countries. One of those countries is Libya."). Having acknowledged to the jury and the district court

28

that a license was required, Sotis should not be permitted to argue the opposite on appeal. *See Brannan*, 562 F.3d at 1307 (holding that when the defendant invites the error, this Court is barred from reviewing the claimed error on appeal).

At a minimum, Sotis's claim that the government failed to show that a license was required is subject to plain-error review. He cannot satisfy that standard because the government provided ample evidence that the rEvo rebreathers that Sotis exported were controlled for export on the Commerce Control List and a license was required to export them to Libya. Special Agent Wagner and Michael Tu, a senior engineer at the Commerce Department's Bureau of Industry and Security, both testified at trial that the rebreathers were on the Commerce Control List and that a license was required to export them to Libya. D.E.175:69-71, 199-200; Br. 21. The defendants' counsel did not cross-examine Tu, and they did not challenge Special Agent Wagner's testimony on any of these points. D.E.175:202.

Even if the government were required to prove that the rEvo rebreathers were the specific type of rebreathers that are included on the Commerce Control List, there was sufficient evidence for the jury to make that finding. Two types of rebreathers are on the Commerce Control List and thus are controlled for export to certain countries: closed circuit and semi-closed circuit rebreathers. D.E.175:197-

29

200.  Tu testified that "[a] closed-circuit rebreather is a device that a diver will use that will not produce any bubbles [when] the diver exhale[s].  So it will keep all of the exhalation gas, all of the $CO_2$ that a diver is exhaling within that closed circuit."  D.E.175:198; *see* D.E.177:16.  He also testified that "[s]emi-closed circuit rebreathers will operate under similar principles, however, there will be some exhalation gases."  D.E.175:198.  The jury could have reasonably found that the rEvo rebreathers matched those descriptions because Robotka testified that the rEvo rebreathers "don't put out any bubbles," except perhaps "on the ascent."  D.E.177:121-22; *see* D.E.175:200.  Moreover, the rEvo manual placed into evidence shows that the manufacturer itself considered the rebreathers at issue to be closed circuit rebreathers (or CCRs).  *See* Gov't Ex. 3.

Several witnesses also testified that, like closed and semi-closed circuit rebreathers, the rEvo rebreathers permit divers to avoid detection.  They explained that these rebreathers do so by enabling divers to dive deeper and to stay underwater for longer periods of time.  *See, e.g.*, D.E.177:16-18, 31, 40-41, 122-23; D.E.175:52-53, 200; *see also* D.E.175:57, 78.  They further explained that because the rebreathers have such "stealth-oriented" characteristics, the rebreathers also have "a distinctive military application."  D.E.178:66, 69; *see* D.E.177:16-18, 30-31, 36-37, 40-41, 45-46; D.E.159:8; D.E.175:52, 57-58, 199-200.  As Tu

30

testified, the rebreathers could be a "major contributor to military and enhanced military capability." D.E.175:199-200. Robotka also testified that "the rEvo rebreather that Add Helium sold, and that Peter Sotis had and also the rebreather in question that was sold to Osama [Bensadik], was actually being reviewed by NEDU, which is the Navy Experimental Dive Unit, for use in the military." D.E.177:16, 125; *cf.* D.E.177:127 (noting that the rEvo rebreathers ultimately "failed the test when they were applied by the military"). Voissem acknowledged that exporting these rebreathers to Libya raised "terrorism concerns." D.E.178:59. Given all this evidence that the rEvo rebreathers were the type of rebreathers controlled for export to Libya, Sotis's insufficient-evidence claim, raised for the first time on appeal, is meritless.

B. The Evidence at Trial Was Not a Variance from the Allegations in the Indictment

Sotis also asserts that there was a fatal variance between the evidence at trial and the allegations in the indictment. Sotis claims that, while the indictment described the rEvo rebreathers as "closed circuit rebreathers," the government's evidence stablished instead that the rebreathers were "open-circuit" rebreathers. Br. 23-28. Sotis did not raise this claim below, so review is limited to plain error. *United States v. Wilson*, 788 F.3d 1298, 1312 (11th Cir. 2015). This Court should

31

reject the claim because it is effectively a repackaging of his sufficiency claim and is meritless for the same reasons.

A variance occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. *United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997) (noting that this Court views the evidence "in the light most favorable to the government as [it] must do in all sufficiency claims"). The evidence presented at trial was not a variance from the allegations in the indictment. As explained above, even if the government were required to show that the rEvo rebreathers were closed circuit rebreathers or had a military application, the evidence at trial was sufficient for the jury to make those findings.

Sotis argues that evidence presented *at sentencing* suggested that the rEvo rebreathers could have been open circuit rebreathers. Br. 19, 24-26, 28. But that evidence was presented by his counsel. And even Sotis's own witness at sentencing testified that the rEvo rebreathers are semi-closed circuit and therefore are on the Commerce Control List. D.E. 174:34, 36-38. Sotis cannot credibly claim that any alleged "variance" resulting from evidence he presented at sentencing caused him unfair surprise at trial or prevented him from preparing a defense. If Sotis were correct, then a variance would arise anytime a defendant presented evidence disputing the government's charges. That is not the purpose

32

the fatal-variance doctrine was meant to serve.  The purpose of the fatal-variance doctrine is "to preserve a defendant's right to be on notice of the charge brought in the indictment." *United States v. Williamson*, 53 F.3d 1500, 1512 n.4 (10th Cir. 1995) (internal quotation marks and citation omitted).  The charges properly notified Sotis that the rebreathers were on the Commerce Control List and required an export license.  As discussed above, the government's trial evidence established those facts, and Sotis's counsel expressly stated that he did not dispute them.

Sotis also suggests that the evidence he presented at sentencing was material proof in his favor.  But he does not explain why he did not present it at trial.  To the contrary, his counsel affirmatively declined to dispute that a license was required.  Sotis argues that his counsel could not have objected to the government's evidence that the rebreathers were "closed circuit" rebreathers because the government described the rebreathers as such in the indictment.  Br. 23, 28.  But that description would not have prevented his counsel from challenging the government's proof at trial.  Sotis was free to present evidence that the rEvo rebreathers were not the type of rebreathers that required an export license, but he did not do so.

Even if a variance occurred, the variance was not material.  Tu testified that closed circuit rebreathers "will not produce any bubbles from the diver['s]

33

exhal[ation]" and that semi-closed circuit rebreathers will produce "some

exhalation gases."  D.E.175:198.  Robotka testified that the rEvo rebreathers

"don't put out any bubbles," except perhaps "on the ascent."  D.E.177:121-22.

That acknowledgement suggests, at most, that the rEvo rebreathers could have

been semi-closed circuit rebreathers.  But any such variance would not be material

because, as Tu testified, semi-closed circuit rebreathers are also on the Commerce

Control List and require a license for exportation to Libya.  D.E.175:197-200; *see*

Br. 18.  Moreover, Tu's and Robotka's testimony refutes Sotis's claim that the

rebreathers could have been "open-circuit, underwater equipment that was not

restricted for export to Libya."  Br. 23.  Sotis does not point to any trial evidence

suggesting otherwise.

    In any event, Sotis cannot establish substantial prejudice from the

government's description of the rebreathers as "closed circuit rebreathers."  *See*

*United States v. Flynt*, 15 F.3d 1002, 1005 (11th Cir. 1994).  "A variance between

allegations and proof is reversible error only when it actually prejudices the

defendant."  *United States v. Jones*, 913 F.2d 1552, 1560 (11th Cir.1990).  "In

order to show substantial prejudice from a variance, a defendant must show that

the proof at trial differed so greatly from the charges that he was unfairly surprised

34

and was unable to prepare an adequate defense." *Wilson*, 788 F.3d at 1312
(internal quotation marks and citation omitted).

Sotis argues that he established substantial prejudice because, had the
government properly alleged that the rEvo rebreathers were semi-closed circuit
rebreathers, "all evidence regarding the more dangerous closed-circuit rebreathers
would have been excluded as highly prejudicial." Br. 27-28. But whether the rEvo
rebreathers were best classified as "closed circuit" or "semi-closed circuit" made
no difference here because both types of rebreathers were on the Commerce
Control List and thus were controlled for export to Libya for national security
reasons. *See* D.E.175:197-200. The fact that they are both controlled for national
security reasons demonstrates that they both have military applications and that
exporting them to Libya could harm national security. *See*, *e.g.*, D.E.175:43, 194-
201. Given these shared characteristics, Sotis cannot point to any evidence that
would have been inadmissible even under his version of the facts.

C.  The Evidence Was Sufficient for the Jury To Conclude that Sotis
    Committed the Export-Control Offenses Willfully

Sotis argues that the evidence was insufficient to prove that he committed
the export offenses willfully. Br. 29. Sotis raised this argument below, so this
Court reviews it de novo, "viewing the evidence and all reasonable inferences and
credibility choices in the light most favorable to the government." *See Anderson*,

35

289 F.3d at 1325. Sotis's argument is meritless. In most cases, the jury must infer from the surrounding circumstances that the defendant knew that his conduct violated the law. Here, by contrast, Sotis and his agents were *expressly informed by a government agent* that it would be illegal to ship the rebreathers, and they did it anyway. The evidence of willful conduct was overwhelming.

The evidence showed that Sotis knew from multiple sources that a license determination from the Commerce Department was necessary before the rebreathers could be shipped to Libya. In a July 28 email exchange, Sotis told Voissem to "look into" Commerce Department requirements after Voissem told him that their shipper had refused to ship the rebreathers to Libya because the Commerce Department "needed to approve each item," given the "concern for terrorism." D.E.159:8. On July 29, Voissem emailed Sotis that a Commerce Department official told her "that shipping to Libya was probably not going to happen because of how volatile" the situation in Libya was at the time. *Id.* She also told Sotis about a presidential declaration banning exports to Libya. *Id.* Robotka testified that, on August 4, he told Sotis about his meeting with Special Agent Wagner and, in particular, that Special Agent Wagner made clear that Add Helium "could not release the shipment," that transshipping the items "was also illegal," and that Add Helium would have to wait for a license determination

before the items could leave Add Helium's warehouse.  D.E.177:48, 215-216;

D.E.159:9; *see* D.E.178:72.

Voissem testified that, although she and Sotis knew no license determination

had been made, Sotis instructed her to let the Zaghabs ship the rebreathers to Libya

anyway.  D.E.178:62, 67; *see* D.E.159:8.  Shipping documentation and Voissem's

testimony confirm that on August 9, Voissem provided the rebreathers to the

Zaghabs' shipper and knew that the rebreathers were en route to Libya.  D.E.159:9;

D.E.178:63-64.  Robotka testified that the rebreathers would not have left Add

Helium without Sotis's approval.  D.E.177:74.  Robotka also testified that Sotis

told him that Sotis believed he could avoid criminal liability because he made sure

it was Voissem's name, not his own, on the shipping documents.  D.E.159:11.

The evidence also showed that Sotis attempted to conceal his misconduct.

During an August 17 telephone conversation, Special Agent Wagner told Sotis that

a license was required for the shipment, but Sotis "concealed the fact that the

rebreathers had already been shipped to Libya."  D.E.159:10.  Special Agent

Wagner testified that Sotis did not tell him that the rebreathers had been shipped

until August 24, when Special Agent Wagner confirmed in person that a license

was required.  *Id.*  In addition, Voissem testified that Sotis instructed her not to tell

the Zaghabs about the August 4 meeting with Special Agent Wagner and that she

37

complied with his instructions.  D.E.178:74.  Although Sotis told Mohammad

Zaghab that a Commerce Department agent visited Add Helium's warehouse, Sotis

falsely said that the agent "didn't say anything" to Sotis and that none of his

employees spoke with the agent.  D.E.176:51-53.

Around August 4, "Sotis instructed his employees to stop communicating

with him over email regarding the rebreather shipment to Libya."  D.E.159:9.

Robotka testified that, after he and Special Agent Wagner learned on August 24

that the rebreathers had been shipped to Libya, Sotis told Robotka that "no one was

to speak to Special Agent Wagner without his approval."  D.E.159:11.  The

government subsequently served Add Helium with an administrative subpoena.

Robotka testified that Sotis wanted approval over anything that was provided to the

government in response to that subpoena.  D.E.177:217.  The case agents testified

that responsive emails to and from Sotis were "withheld" and "were later

discovered during a search warrant."  D.E.159:11.  Voissem testified that after the

administrative subpoena was served, Sotis told her not to communicate with

anyone from the government and that "everything needed to go through [him] to

handle."  D.E.178:52; D.E.177:67; D.E.159:11.  Robotka also testified that Sotis

threatened to kill him if he spoke to anyone about the shipment.  D.E.159:11-12;

D.E.177:68-74.

Finally, the evidence showed that Sotis violated export controls for financial gain. *See* D.E.177:218.  Robotka testified that the Libya shipment was "a very large order" for Add Helium.  D.E.177:25, 64.  In an email, Sotis made it clear to his team that the order was important because it was a lucrative sale that could lead to more business in the future.  D.E.110-28; D.E.177:25, 125-30 (Robotka testifying that Sotis described the order as a "whale").  Generating business was critical to Sotis because, as Sotis told Robotka, Add Helium was having serious "financial issues" and had "an immediate need for funding."  D.E.177:50-53.  Add Helium owed debts of at least $30,000, and Sotis needed help paying those debts. *Id.*  The Libya shipment, including the rebreathers and other diving equipment, would bring over $100,000 to Add Helium.  D.E.177:19-25; D.E.176:22-29. Viewed in the light most favorable to the government, the evidence was more than sufficient for the jury to find that Sotis acted willfully.

Sotis's argument (Br. 28) that he reasonably believed the rebreathers did not have a military application and thus did not require an export license is refuted by the evidence.  Robotka testified that Sotis "was very well aware of the rebreathers' applications and how they were a—not just a civilian tool, but could be used for . . . military diving."  D.E.177:16.  Sotis nonetheless notes that, according to Robotka's testimony, the rebreathers had "failed the test" when they were

reviewed by the military.  D.E.177:127.  It is unclear what Robotka meant, but

Sotis does not point to any evidence showing that he (Sotis) was aware of the

failure.  In any event, the evidence is sufficient for the jury to conclude that Sotis

knew the rebreathers had a military application when Sotis knew from multiple

sources that a license determination from the Commerce Department was

necessary before the rebreathers could be shipped to Libya.

Sotis also argues that he was not trying to evade export controls by arranging

for the Zaghabs to ship the rebreathers because he understood that the Zaghabs

would be making "the ultimate decision whether a license was needed."  Br. 29.  If

that were true, he would not have falsely told Mohammad Zaghab that Special

Agent Wagner "didn't say anything" about a license determination.  D.E.176:51-

53.  Sotis continues to blame others, including the Zaghabs, for the shipment, but

the Zaghabs repeatedly sought information about the shipment to ensure they were

complying with applicable rules and regulations.  *See*, *e.g.*, D.E.110-48;

D.E.176:130-31.  It was Sotis who instructed Voissem to stay quiet.  D.E.178:74.

As Robotka testified, Sotis thought he would get away with violating export

controls because his signature was "not on the documents."  D.E.159:11.

40

D. <u>The Evidence Was Sufficient for the Jury To Conclude that Sotis
Conspired To Violate IEEPA</u>

Sotis argues that the evidence was insufficient to show that he and Voissem

conspired to violate IEEPA because it was the Zaghabs' company, rather than

Sotis's company, that shipped the rebreathers to Libya. Br. 38-40. Sotis raised

this claim below, *see* D.E.115, so this Court reviews it de novo. *See Anderson*, 289

F.3d at 1325.

Viewed in the light most favorable to the government, the evidence was

sufficient for the jury to conclude that Sotis and Voissem conspired to violate

IEEPA by arranging for an intermediary (Ramas LLC) to export the rebreathers to

Libya without a license. D.E.110:9-11. Tu testified that a license would be

required even "if a vendor in the United States had arranged for a shipping

company to pick up the rebreathers from their U.S. office and then have them

transported to Libya." D.E.175:201. According to Tu, "the activity still meets"

the definition of an export because "[a]n export is defined as shipping or

transmission from the United States." *Id.*

Sotis's argument also conflicts with the general principle of criminal law

that a defendant cannot escape liability by acting through an intermediary. *See,

e.g.*, *United States v. Maloney*, 71 F.3d 645, 650 (7th Cir. 1995) (upholding

conviction of judge who accepted bribes through "bag men"). Accordingly, the

41

district court correctly found that "the evidence was clear that an export license would likely be required to be legal, yet [Sotis and Voissem] withheld from Ramas LLC, the Virginia-based shippers, that fact and their ongoing legality concerns reflected in the emails among themselves and discussions with Special Agent Wagner." D.E.128:6. Sotis argues that he and Voissem did not withhold this information from Ramas LLC but rather reasonably believed that the rebreathers were not dual-use items and thus did not require an export license. Br. 40. For the reasons explained above, there was sufficient evidence for the jury to find the contrary. Sotis offers no sound reason to disturb that finding.

II.    The Witnesses Did Not Invade the Province of Jury

Sotis argues that the district court admitted testimony from two of the government's witnesses, Tu and Special Agent Wagner, that invaded the province of the jury. Br. 40-42. Sotis objected to Special Agent Wagner's testimony, but not to Tu's testimony. *See* Br. 41. As to Tu's testimony, this Court reviews the district court's decision for plain error. *Clarke*, 649 F. App'x at 843. As to Special Agent Wagner's testimony, this Court reviews the district court's decision for an abuse of discretion. *Lee*, 427 F.3d at 896. Any error is subject to harmless-error review, which means that reversal is not required unless there is a reasonable possibility that the improperly admitted evidence had a substantial influence on the

42

outcome of the proceedings. *Bradley*, 644 F.3d at 1270.  Under either standard of review, the district court did not err because the evidence was admissible.

First, the district court did not err, much less plainly err, in permitting Tu to testify that the rEvo rebreathers were the type of rebreathers that are listed on the Commerce Control List and thus require an export license.  Sotis claims that the testimony removed from the jury's consideration a factual issue because the jurors did not have the facts to determine for themselves whether the rebreathers were closed circuit or semi-closed circuit rebreathers.  Br. 40-43.  Even if that were true, Sotis does not explain how this testimony amounted to an opinion on the ultimate question of the defendant's guilt or otherwise invaded the jury's province, particularly in a case where the defendant did not dispute the relevant fact.  In any event, Tu explained the underlying characteristics that made the rEvo rebreathers subject to the license requirement.  Tu testified that closed circuit rebreathers do not produce bubbles and that semi-closed circuit rebreathers produce some bubbles.  D.E.175:198.  Moreover, the jurors were able to decide for themselves whether the rEvo rebreathers matched those descriptions because Robotka testified about these rebreathers' characteristics.  In particular, Robotka testified that the rEvo rebreathers do not produce bubbles, except perhaps "on the ascent." D.E.177:121-22.

43

Any error that the district court made in admitting Tu's testimony was harmless.  There was no dispute that the rebreathers were on the Commerce Control List and required an export license.  Also, the district court properly instructed the jury on weighing expert testimony.  The district court instructed the jury that although Tu has "knowledge of the requirements to obtain export licenses," his knowledge "does not mean you must accept the witness' opinion.  As with any other witness' testimony, you must decide for yourself whether to rely on that opinion."  D.E.178:120; *see United States v. Barton*, 909 F.3d 1323, 1338 (11th Cir. 2018) ("[P]roper instruction to the jury on weighing expert testimony may render errors in admitting the evidence harmless.").

Second, the district court did not abuse its discretion in allowing Special Agent Wagner to testify during the government's redirect examination that he had "never seen this much knowledge in a case like this."  D.E.175:166.  According to Sotis, this testimony was improper under *United States v. Fuentes-Coba*, 738 F.2d 1191 (11th Cir. 1984).  In *Fuentes-Coba*, the defendant claimed that the Cuban Assets Control Regulations were so complex that his misunderstanding of them excused his otherwise criminal conduct.  *Id.* at 1197.  At trial, the government called the former chief counsel and director of the office responsible for enforcing the regulations to explain those regulations.  *Id.*  On plain-error review, this Court

44

held that "the testimony did not invade the province of the court in its determination of the applicable law . . . or of the jury in its evaluation of the facts in light of that law." *Id.* This Court explained that the witness was allowed to explain the regulations and "did not resolve the ultimate question of whether the [defendant's] activities constituted willful violations of the law." *Id.*

Sotis's reliance on *Fuentes-Coba* is misplaced. Although Special Agent Wagner's testimony concerned the question whether Sotis acted knowingly, Special Agent Wagner did not testify that, in his opinion, Sotis was guilty of the export-control offenses. Rather, Special Agent Wagner's testimony indicated that, of the similar cases he had observed, this case evidenced the most knowledge. Special Agent Wagner's opinion was offered only after Sotis's counsel asked about his experience with other export violation cases involving rebreathers and whether he had charged anyone else criminally for such a violation. D.E.175: 130-31, 165-66 (district court admitting the testimony because Sotis's counsel "opened the door"). Moreover, his opinion was a rational inference based on his personal participation and observations as a special agent for the Commerce Department and therefore did not exceed the permissible bounds of witness testimony. *See United States v. Richard*, 969 F.2d 849, 854 (10th Cir. 1992) (finding no error where a government expert testified that "no drug dealer of a drug deal this size is

45

going to have four persons that don't know anything about it"); *United States v. Sandoval-Ortiz*, 182 F. App'x 380, 382 (5th Cir. 2006) (holding that the officer's testimony about the defendant's knowing participation in a drug deal did not invade the jury's province).

Even if the district court abused its discretion in admitting the testimony, the error would not warrant reversal because any such error was harmless. Special Agent Wagner's statement constituted only a small portion of the government's case, and as explained above, the evidence of Sotis's willfulness was overwhelming. *See United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990) ("[W]here an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted."); *Barton*, 909 F.3d at 1337-38 (concluding that any error in admitting the challenged evidence was harmless because the other evidence of the defendant's guilt was "overwhelming"). Also, the jury was properly directed to evaluate the testimony and to decide for itself what weight, if any, to accord the testimony. *See* D.E.178:119 (instructing the jurors to decide whether they "believe what each witness had to say and how important that testimony was" and, "[i]n making that decision," to "believe or disbelieve any witness, in whole or in part").

46

Sotis therefore cannot show any reasonable likelihood that the alleged error had a substantial influence on the outcome of the proceedings.

III.    Sotis's Sentence Was Reasonable

Sotis argues that his sentence was procedurally unreasonable because the district court incorrectly calculated his advisory Guidelines range. Br. 43-49. The parties agree that the statutory index of the Guidelines lists, in relevant part, both U.S.S.G. § 2M5.1 and U.S.S.G. § 2M5.2 as the Guidelines for violations of 50 U.S.C. § 1705 and 18 U.S.C. § 554(a). *See* U.S.S.G. App. A. According to Sotis's argument on appeal, the appropriate Guideline here is U.S.S.G. § 2M5.1(a)(2), which would set the base offense level at 14, and the district court erred in applying U.S.S.G. § 2M5.2(a)(1), which set the base offense level at 26. Br. 43-49. Sotis did not make this argument in the district court,[7] so this Court reviews the district court's decision regarding the proper base offense level for plain error. *See Bennett*, 472 F.3d at 831-32. The district court did not err, plainly or otherwise, in applying U.S.S.G. § 2M5.2(a)(1).

U.S.S.G. § 2M5.2(a)(1) applies to offenses involving the exportation of "arms, munitions, or military equipment or services without required validated

---

[7] Sotis's objection in the district court was that U.S.S.G. § 2B1.1 should apply. D.E.137:6. He affirmatively argued that "none of the provisions of U.S.S.G. § 2M5 are applicable to Mr. Sotis' offenses of conviction." *Id.*

export license."  The district court correctly applied this Guideline because, contrary to Sotis's claim, the rEvo rebreathers fall within the plain meaning of "military equipment."  At sentencing, the district court agreed, over Sotis's objection, with the PSR's finding that the rEvo rebreathers had a military application.  *See* D.E.174:40-43.  At sentencing, Sotis presented testimony from Chauncey Brewster Chapman, III, a friend of Sotis's who had been involved in manufacturing and designing rebreathers.  Chapman testified that the U.S. military "did not accept" the rEvo rebreather "for use by the fleet" and that he did not think the rEvo rebreather would be "useful in active military missions."  D.E.174:33.  But he also testified that the rEvo rebreather was "used for training by the U.S. military" and that someone could use the rEvo rebreather "for a nefarious purpose" because the rEvo rebreather has "far greater range, far greater stealth" than open-circuit rebreathers.  D.E.174:38-39.  After considering this testimony and the evidence presented at trial, the district court correctly found that the rEvo rebreathers have a military application.  As the district court explained, although the rebreathers may not have "as extensive a military application from the defendant's perspective, it does have a military use based upon the evidence in the case."  D.E.174:43.

48

Sotis is incorrect that, for U.S.S.G. § 2M5.2 to apply, the controlled item must be on the Munitions List.  Br. 45.  Sotis does not cite any authorities to support his reading of U.S.S.G. § 2M5.2 but asserts that this Court should invoke the rule of lenity in interpreting the Guidelines.  The "touchstone" of the rule of lenity, however, is statutory ambiguity.  *Lewis v. United States*, 445 U.S. 55, 65 (1980).  There is no ambiguity here.  Application Note 1 states:

> Under 22 U.S.C. § 2778, the President is authorized, through a licensing system administered by the Department of State, to control exports of defense articles and defense services that he deems critical to a security or foreign policy interest of the United States.  The items subject to control constitute the United States Munitions List, which is set out in 22 C.F.R. Part 121.1.  Included in this list are such things as military aircraft, helicopters, artillery, shells, missiles, rockets, bombs, vessels of war, explosives, military and space electronics, and certain firearms.

By its plain language, Application Note 1 merely describes the type of items the State Department controls for exportation under 22 U.S.C. § 2778.  It does not set forth an exclusive list of controlled items that are eligible for the Guideline's application.  Indeed, the statutory index lists U.S.S.G. § 2M5.2 as one of the Guidelines for violations of 50 U.S.C. § 1705(a).  That statute makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation

49

of" regulations administered by the Commerce Department under 15 C.F.R. § 730.3.[8] Those are the regulations that Sotis violated here.

Even if Sotis were correct that U.S.S.G. § 2M5.1, rather than Section 2M5.2, applies, that would not help him because he would still be subject to the same offense level of 26 under that section. U.S.S.G. § 2M5.1 applies to offenses involving the "evasion of export controls" and "financial transactions with countries supporting international terrorism." It sets the base offense level at 26 if national security controls were evaded, and 14 otherwise.

In this case, Section 2M5.1 would result in an offense level of 26 because Sotis evaded national security controls by exporting rebreathers that had military applications to Libya. As Tu testified, the regulations Sotis violated control the exportation of rebreathers to Libya for national security reasons. *See* D.E.175:197-200; *see also Singer*, 963 F.3d at 1150 (finding that the Export Administration Regulations control the listed items because they "could be detrimental to the foreign policy or national security of the United States"). Courts have routinely held that export controls imposed under IEEPA constitute "national security

---

[8] Contrary to Sotis's claim (Br. 46), there is no evidence that the district court treated the rebreathers as a "de facto" vessel. The district court explicitly found that "[i]t's not a vessel" when assessing the defense claim at trial that U.S.S.G. § 2X7.2 ("Submersible and Semi-Submersible Vessels") should apply. D.E.174:18.

controls" for purposes of U.S.S.G § 2M5.  *See*, *e.g.*, *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997); *United States v. Hanna*, 661 F.3d 271, 293 (6th Cir. 2011); *United States v. Shetterly*, 971 F.2d 67, 76 (7th Cir. 1992); *United States v. Cheng*, 2016 WL 413077, at *5 (D. Mass. Feb. 1, 2016).  Sotis does not cite any contrary authority.

Finally, Sotis argues in passing that his sentence results in an unwarranted disparity with the sentences of similarly situated defendants who have received lower sentences.  Br. 47-49.  The district court correctly rejected this argument.  As the district court explained, unlike Sotis, the defendants in *United States v. Francois*, 661 F. App'x 587 (11th Cir. 2016), and *United States v. Vasquez*, 2018 WL 3814727 (11th Cir. 2018), pleaded guilty.  D.E.174:50-51.  The defendants in *United States v. Piquet*, 372 F. App'x 42 (11th Cir. 2010), and *United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011), were sentenced to *higher* terms of imprisonment than the district court imposed here.  In *United States v. Reyes*, 270 F.3d 1158 (7th Cir. 2001), the defendant was sentenced at a time when U.S.S.G. § 2M5.2 set the base offense level at 22.  D.E.186:53.  The Guideline has since been amended and now sets the base offense level at 26.  *Id.*  In *United States v. Banki*, the court of appeals did not address the defendant's sentence because it vacated some of his convictions and remanded the case to the district court.  685

51

F.3d 99 (2d Cir. 2011); *see* D.E.186:48-49. Sotis does not cite any cases where a similarly situated defendant received a lower sentence.

<u>CONCLUSION</u>

For all these reasons, this Court should affirm Sotis's convictions and sentence.

July 15, 2022

Respectfully submitted,

MATTHEW G. OLSEN
<u>Assistant Attorney General</u>
<u>for National Security</u>

DANIELLE S. TARIN
<u>Attorney</u>
<u>National Security Division</u>
<u>U.S. Department of Justice</u>
<u>Washington, DC 20530</u>

52

<u>CERTIFICATE OF COMPLIANCE WITH VOLUME LIMITATION,</u>
<u>TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1. This response complies with the word limit in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because:

   this response contains 11,145 words.

2. This response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because:

   this response has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point font size and Times New Roman type style.

DATED: July 15, 2022                     /s/ Danielle S. Tarin
                                         Danielle S. Tarin
                                         Attorney for the United States

<u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Number 22-10256.

I hereby certify that I electronically filed the foregoing Opposition of the United States with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on July 15, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: July 15, 2022                    /s/ Danielle S. Tarin
                                        Danielle S. Tarin
                                        Attorney for the United States